Ole K. NILSSEN, Plaintiff,

v.

MOTOROLA, INC., et al., Defendants.

No. 93 C 6333.

United States District Court, N.D. Illinois, Eastern Division.

April 25, 1997.

---

Harry J. Roper, George S. Bosy, John E. Titus, Frank J. Nuzzi, Roper & Quigg, Chicago, IL, for plaintiff.

James M. Amend, Brian D. Sieve, Michael B. Allen, S. Jonathan Silverman, Douglas R. Cole, Kirkland & Ellis, Chicago, IL, James S. Pristelski, George L. Vlamis, Motorola, Inc., Schaumburg, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Ole Nilssen ("Nilssen") has brought suit against Motorola, Inc. and its subsidiary Motorola Lighting, Inc. ("Lighting") (collectively "Motorola," treated as a singular noun to avoid awkwardness) in connection with Motorola's alleged theft of Nilssen's trade secrets before Motorola's 1989 entry into the electronic ballast industry. Nilssen asserts claims for (1) breach of confidential relationship, (2) theft of trade secrets under the Illinois Trade Secrets Act ("Act" or "Illinois Act," 765 ILCS 1065/1 to /9)[1] and (3) quantum meruit/implied contract/unjust enrichment.[2]

Both sides have now filed summary judgment motions under Rule 56, with Nilssen seeking partial summary judgment only as to liability (and not as to damages) and with Motorola asking for a total victory as a matter of law. At this point the cross-motions are fully briefed, with both sides having complied with this District Court's GR 12(M) and 12(N).[3] For the reasons stated in this memorandum opinion and order, Motorola's motion is granted in part and denied in part, while Nilssen's motion is denied.

### Summary Judgment Standards

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those that are reasonable"—in the light most favorable to the non-moving party (*Bank Leumi Le–Israel. B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions are involved, it is neces-

1. Citations to the Illinois Act will take the form "Act § —," omitting the "765 ILCS 1065/" preface.

2. Nilssen's Amended Complaint also asserted a patent infringement claim, which this Court's September 20, 1995 minute order dismissed without prejudice. That claim has since been refiled as a separate lawsuit (96 C 5571) and was reassigned to this Court's calendar pursuant to District Court General Rule ("GR") 2.21(D)(2). Nilssen's original Complaint had also included claims for breach of oral contract and promissory estoppel, but this Court's May 4, 1994 minute order dismissed those claims pursuant to Fed. R.Civ.P. ("Rule") 12(b)(6).

3. GR 12 is designed to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of those facts. Then GR 12(N) requires the nonmovant to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. In cross-motions such as this, each side initially submits his, her or its own GR 12(M) statement, followed by a GR 12(N) statement in response to the other side's opening gun. Nilssen's initial statement is cited "N. 12(M) ¶—," and his responses and statement of supplemental facts are respectively cited "N. 12(N) ¶—" and "N. 12(N) Supp. ¶—." Motorola's submissions are cited in the same way, prefaced by "M." rather than "N."

sary to adopt a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions. And as the discussion in the body of this opinion will show, that is unfortunately true here in spades.[4]

What follows in the *Background* section is limited to an undisputed version of events. Other facts that fit better into the substantive legal discussion will be included later in this opinion.

## Background

Motorola is a leading manufacturer of electronic components and devices. Robert Galvin ("Galvin") was its Chief Executive Officer from 1959 to 1990. Galvin first learned of electronic ballast technology in the 1960s[5]—at a time when that technology was not yet mature—and looked into the possibility of developing electronic ballasts as a new Motorola business every few years thereafter (M.12(M) ¶¶ 16–17).

Nilssen, a former Motorola employee who was fired in 1972, was president and owner of Innovation Center, Inc. at all times relevant to this dispute (Nilssen Dep. 7, 33–40). In a July 12, 1982 letter to Galvin, Nilssen first approached Motorola about possible business opportunities in the electronic ballast business in which Nilssen and Motorola might join forces (M.12(M) ¶ 21). Galvin, interested in evaluating whether Nilssen had developed a technology that might finally allow Motorola to enter that industry, forwarded Nilssen's letter to Levy Katzir ("Katzir")—then Vice President and General Manager of Motorola's New Enterprises Group (M.12(M) ¶¶ 22–23). Katzir and Nilssen then met on October 25, 1982, but that meeting was unproductive and the parties took no further action on any of Nilssen's proposals (M.12(M) ¶ 24).

On February 7, 1986 Nilssen made a second pitch to Motorola, writing Gerhard Schulmeyer ("Schulmeyer")—then General Manager of Motorola's Automotive and Industrial Electronics Group ("Group")—to suggest that he had "available for exclusive licensing proprietary technology that permits the development of electronic ballasts of substantially reduced cost as compared with the least costly of presently available electronic ballasts" (N. 12(N) ¶ 25). Nilssen met with several Motorola representatives on March 18 (M.12(M) ¶ 26; N. 12(N) ¶ 26), and on

---

**4.** This Court, fearful of just such an outcome that would result in an enormous investment of time and effort (and hence money) on the part of the litigants only to end up as a dry run, inquired of both sides' counsel early on whether they would consider granting this Court the right to resolve what might turn out to be contested issues of material (that is, outcome-determinative) facts. After all, a litigant's very invocation of Rule 56 is supposed to reflect counsel's best judgment that there *are* no such issues—that even when viewed favorably to the other side, the facts compel a judgment in favor of counsel's client. And where as here counsel for each side has made such an evaluation in presumable good faith, it might reasonably be assumed that the same evaluation would carry with it the confidence to allow the court to decide disputed matters if the court disagreed with the lawyers' notion that no such disputes stood in the way of a favorable judgment as a matter of law. As it turned out, Motorola's counsel had such confidence in its cause (and hence agreed to this Court's request), while Nilssen's did not reflect that level of confidence (and hence did not agree). To the extent then that the litigants have been burdened with extra effort and expense—and this Court has been saddled with a needlessly unproductive ex-

ercise—the responsibility must be placed at Nilssen's doorstep.

**5.** Carlile "Steve" Stevens ("Stevens")—a witness for Motorola in this litigation—has provided this simple description of the use and history of electronic ballasts (Stevens Aff. ¶¶ 3–4):

3. Electronic ballasts are devices used to power fluorescent lamps. A ballast performs two primary functions: (i) it provides adequate voltage to start or ignite the lamp; and (ii) it limits the lamp current once the lamp is ignited. A fluorescent lamp requires greater voltage to start than it needs for continued operation after starting. Thus, a ballast must provide a high voltage initially to ignite the lamp, but then reduce the voltage after lamp ignition to limit the current flowing through the lamp.

4. During the 1940's, engineers at General Electric ("GE") discovered that operating fluorescent lamps at frequencies higher than the 60Hz frequency used for power distribution in the United States improved energy efficiency. Beginning in the late 1950s and early 1960s, engineers and independent inventors began developing transistor-based circuits to accomplish this frequency conversion. These transistor-based ballasting circuits are referred to as electronic ballasts.

March 22 he followed up with a letter to Wallace Leyshon at Motorola, reiterating several of the key issues discussed at the March 18 meeting. That letter disclosed (1) Nilssen's understanding of the key accounts in the electronic ballast industry, (2) a bill of materials for Nilssen's prototype ballast, (3) Nilssen's figures regarding the expected cost savings and profitability from use of his ballast and (4) Nilssen's analysis of the energy savings to result from his technology (M.12(M) ¶ 28).

Nilssen and Motorola officials met several more times in 1986, but ultimately Motorola again decided not to pursue the electronic ballast business (M.12(M) ¶¶ 29–30). Nilssen wrote Galvin on November 17, 1986 criticizing that decision, and Galvin responded in a December 2 letter to Nilssen (M.12(M) ¶¶ 31–33; N. 12(N) ¶ 33):

> We have been giving attention to this business opportunity for more than a score of years. We have evaluated many technologies. We recognize that the trend in the application of electronics in the ballast has been one that has grown very slowly. We do not interpret that your technology is of the nature that it will hasten this very extensively, and therefore we conclude that as a business strategy, it is not a good business for us to go into at this time, or for that matter at any time in the near future.

> So we just plain have a difference of opinion with regard to business opportunity. Clearly, one such as yourself could prove our judgment wrong, but we have nevertheless made, I believe, a very objective judgment and we do not intend to enter this business.

Nilssen then wrote Galvin a December 6 letter, emphasizing that Motorola had not yet seen Nilssen's circuits and was thus not competent to judge the adequacy of his technology (M.12(M) ¶ 34; N. 12(N) ¶ 34).

In mid–1987 Motorola's Group began another review of Nilssen's technology. Schulmeyer gave Phil Gunderson ("Gunderson")—then a Group Vice–President—one of Nilssen's earlier communications about electronic ballasts and asked him to "look into it" (N.

12(N) ¶ 35). Gunderson found Nilssen's ideas worthy of a closer look, and on September 4, 1987 Nilssen and Motorola executed a Non–Disclosure Agreement (the "1987 Agreement") to establish the terms under which Nilssen would provide additional confidential information to Motorola (N. 12(N) ¶ 36). Essential provisions of the 1987 Agreement included these:

* "Confidential Information" was defined as "any device, graphics, written information or information in other tangible forms that is disclosed, for evaluation purposes, to Motorola by [Nilssen] relating to [electronic ballasts] and that is marked at the time of disclosure as being 'Confidential' or 'Proprietary.' "

* Information disclosed orally or visually and identified at the time of such disclosure as "Confidential" was to be considered as "Confidential Information" only if reduced to tangible form, marked "Confidential" and transmitted to Motorola within 30 days of such oral or visual disclosure.

* "Confidential Information" was explicitly defined to exclude "any information which: (a) Is or becomes publicly known through no wrongful act on Motorola's part; or (b) Is, at the time of disclosure under this Agreement, already known to Motorola without restriction on disclosure; or (c) Is, or subsequently becomes, rightfully and without breach of this Agreement, in Motorola's possession without an obligation restricting disclosure; or (d) Is independently developed by Motorola without breach of this Agreement; or (e) Is furnished to a third party by [Nilssen] without a similar restriction on the third party's rights; or (f) Is explicitly approved for release by written authorization of [Nilssen]."

* Motorola was not to "disclose the 'Confidential Information' to any third party" nor to "use the 'Confidential Information' for any purpose" other than "evaluation purposes, which evaluation is to be com-

pleted within two months from [September 1, 1987]." [6]

From September 1987 to May 1988 Gunderson and other Motorola personnel evaluated its possible entry into the electronic business industry (M.12(M) ¶¶ 44–45; N. 12(N) ¶ 45). During that period Nilssen "relayed a lot of information" to Motorola employees—including Galvin—on the subject of electronic ballasts in the form of both documents and oral discussions (M.12(N) ¶ 124, 31). That information comprised both business information—including projections of market size, potential marketing opportunities and estimated manufacturing costs—and technical information as to the design of Nilssen's electronic ballast (M.12(M) ¶ 44). Among other disclosures Nilssen made in that second category, Nilssen provided Motorola with a prototype ballast containing many of his designs, and he later designed and built an additional prototype based on a set of performance specifications identified by Gunderson (M.12(N) ¶ 127–28).

During that same September 1987 to May 1988 period, Gunderson also had Bob Elliott ("Elliott")—a Motorola product manager and engineer—and David Bergemann ("Bergemann")—a marketing specialist—take an independent look into the electronic ballast industry (M.12(M) ¶ 46; Gunderson Dep. 79, 110–11; Ailing Dep. 37–38). Bergemann conducted a market study and prepared a 150–page report based on information from the United States Department of Commerce and on interviews with over 27 individuals, including Motorola employees, Nilssen and outside consultant William Ailing ("Ailing") (M.12(M) ¶ 46; M. Ex. Tab 19). In April 1988 Bergemann and Elliott prepared a "Presentation on Electronic Ballasts for Fluorescent Lamps" for the Group, detailing financial and technical objectives for Motorola's potential entry into the electronic ballast industry (M.12(M) ¶ 47; M. Ex. Tab 21).

On May 6, 1988 Fred Tucker ("Tucker")—then Group's Vice–President and General Manager—decided that it still would not pursue that business. Tucker instructed Gunderson to stop work on the project (M.12(M) ¶ 48). On May 20 Gunderson wrote to Nilssen to confirm that Group had decided not to enter the business, explaining that it would be "too great a departure from our core business plans" (M.12(M) ¶ 49). Gunderson returned to Nilssen all documents that Nilssen had marked "confidential" pursuant to the 1987 Agreement, although Nilssen now testifies that he did not then receive all of those documents (M.12(M) ¶ 50; N. 12(N) ¶ 50).

In May 1988 Nilssen wrote to Galvin and again asked him to reconsider Group's decision (M.12(M) ¶ 54). Galvin, Gunderson and other Motorola employees then proceeded with a series of meetings to discuss Group's analysis and the Nilssen technology (M.12(M) ¶ 55; M. 12(N) ¶ 55). In August 1988 Galvin assigned Katzir—still with the New Enterprises Group—to evaluate the electronic ballast business once again. Katzir asked that Gunderson assist him in that task, and one of the latter's first assignments was to detail to Katzir all that he knew of the industry (M.12(M) ¶ 57; N. 12(N) ¶ 57; Gunderson Dep. 222).[7] Katzir and Gunderson proceeded to conduct a further evaluation of the industry's market, although both the scope of their research and the degree to which their review was independent of Nilssen contributions are matters of dispute (M.12(M) ¶¶ 58–62; N. 12(N) ¶¶ 58–62).

After expressing concerns to Nilssen about his history of sending Motorola unsolicited material and as to his possible litigiousness, Motorola sought to modify the confidentiality agreement governing Nilssen's disclosures (M.12(M) ¶ 63; Nilssen Dep. 347; M. Ex. Tab 30). On September 27, 1988 Nilssen, Gunderson (on behalf of Motorola) and Ailing (as an outside consultant to Motorola) executed a new Non–Disclosure Agreement (the "1988 Agreement")[8]

---

**6.** "Evaluation purposes" are not defined in the 1987 Agreement, which was drafted by Motorola (N. 12(N) ¶¶ 36, 43).

**7.** Discovery during the course of this litigation has uncovered several of Nilssen's disclosures, designated as "confidential" per the 1987 Agreement, in Katzir's files (N. Ex. Tab 39).

**8.** Nilssen asserts at N. 12(N) ¶ 65 that he signed the 1988 Agreement under duress—a characterization that, though perhaps permissible for a lay

that provided in pertinent part (M.12(M) ¶¶ 68–71; M. Ex. Tab 31):

* Nilssen agreed to disclose to Ailing on a confidential basis his pending patent applications covering inventions embodied in the prototype ballasts that Nilssen sent to Motorola. All other information disclosed to Ailing was "on a non-confidential basis and without obligation of any kind."

* Any future confidential disclosures by Nilssen to Motorola were limited to pending patent applications, which Motorola agreed to receive in confidence. "Any other information" that Nilssen disclosed was to be "on a non-confidential basis and without obligation of any kind, unless Motorola agree[d], in writing to make an exception." [9]

* Motorola had no obligation to maintain the confidentiality of any information that became publicly available.

* Motorola and Nilssen "agreed to discuss the confidentiality of information that Motorola has previously received from [Nilssen] in regard to electronic ballasts," the stated goal being "to more specifically identify what it is that should be treated as confidential."

Ailing then completed a "Solid State Ballast Report" for Motorola on October 15, 1988. That report evaluated both technical and business issues involved in Motorola's possible entry into the electronic ballast business, and it concluded with a recommendation that Motorola should go forward with the business using Nilssen's technology (M.12(M) ¶ 78; M. Ex. Tab 33).

Meanwhile, in September 1988 Nilssen met with Katzir, Gunderson and Motorola attorneys to discuss possible compensation for Nilssen's work. Katzir asked Nilssen to propose a royalty on a per ballast basis (M.12(M) ¶¶ 74–75). When Nilssen refused to do so, Katzir warned that if the parties could not agree on compensation Motorola would "go ahead without [him]" (M.12(M) ¶ 76). Gunderson followed up on that meeting with an October 3 letter to Nilssen that outlined three possibilities for Motorola's entry into the electronic ballast industry: (1) entry without Nilssen's participation and without his technology, (2) entry using only a limited amount of Nilssen's technology or (3) entry with Nilssen's participation and using substantially all of his technology (M.12(M) ¶ 77). Importantly, Gunderson's letter also confirmed the parties' agreement, based on a meeting that they had held the next day after signing the 1988 Agreement, as to identifying whether any of Nilssen's previous disclosures were to be treated as confidential (M. Ex. Tab 32):

This is to confirm the various "to-do's" that resulted from our meeting with you last Wednesday, and also to confirm some of the conclusions we reached.

Ole's [Nilssen's] "to-do's":

\* \* \* \* \* \*

2. Review your previously-submitted documents and determine whether any of them should have been stamped as "confidential". Our intent is to more specifically identify the information that you regard as confidential.

person unfamiliar with the legal import of that term, is not supported by the record. *Pierce v. Atchison, T. & S.F. Ry.*, 65 F.3d 562, 569 (7th Cir.1995) (citation omitted and alteration in original) has outlined the standard of duress necessary for relief from contractual obligations:

Duress is not shown by the fact that one was subjected to mere annoyance, vexation, personal embarrassment, a difficult bargaining position or the pressure of financial circumstances. There must have been some imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness[es] of another.

Moreover, Illinois law (applicable to such a substantive defense to liability on Nilssen's state law claim) requires that duress be proved on the basis of clear and convincing evidence (*Wallenius v. Sison*, 243 Ill.App.3d 495, 503, 183 Ill.Dec. 448, 453, 611 N.E.2d 1096, 1101 (1st Dist.1993)). Even from a pro-Nilssen perspective of the facts, he fully understood the terms of the 1988 Agreement (M.12(M) ¶ 72), but he felt pressure to sign in order to proceed with business discussions and "not to be a total spoiled [sic] sport" (Nilssen Dep. 361). That set of circumstances certainly does not rise to the level that the cases require to relieve Nilssen of his contractual duties.

9. Motorola never agreed to any such exception (M.12(M) ¶ 70).

Neither party has cited to any part of the record indicating whether or to what extent Nilssen followed up on that "to-do"—but as the later discussion reflects, his action or inaction in that respect makes no difference to the analysis.

On October 18 Nilssen wrote to Galvin, criticizing Katzir's preference for an "arm's length relationship whereby Motorola would merely license from [Nilssen] a few specific patents." Nilssen argued that Katzir's position "effectively prevents the formation of what I believe would be by far the best arrangement for Motorola as well as myself: namely, the establishment of a partnership-like relationship.... " (M. Ex. Tab 34). On November 2 Galvin responded (M. Ex. Tab 35):

> While we have not yet completed our business evaluation, and we do not plan to decide prior to year end, it is important that I communicate to you at this time Motorola's position, so that we can jointly determine, as soon as possible, whether there is a good foundation for a mutually acceptable relationship, should we decide to pursue the Electronic Ballast business.
>
> It is important to make this determination at this time since it seems that there is a significant gap between our respective positions regarding the nature of the relationship, and the compensation level for your patents and know-how.

Galvin proposed a "framework" for "final negotiations" in which Nilssen's compensation would be a royalty of "around 0.5% on Sales" plus "a certain minimum" for technical assistance. Finally, Galvin offered to continue discussions "if there is a positive determination that a financial relationship with you appears doable" (*id.*).

Nilssen responded to Galvin with a November 8 letter suggesting that Motorola's "compensation proposed" was "unreasonably low" (M. Ex. Tab 36). Nilssen's position was that he be paid "one third of the total value clearly attributable to [his] contribution"

(*id.*).[10]   In light of that "significant gap" between Nilssen and Motorola, Galvin sent Nilssen a November 22 letter terminating their discussions. Galvin relatedly directed Gunderson to return to Nilssen any confidential documents that Motorola had received (M.12(M) ¶ 84; M. Ex. Tab 38). Although Gunderson sent Nilssen a December 19 letter returning those confidential documents, Gunderson kept one "archive copy" for Motorola's files (N. 12(N) ¶ 84; M. Ex. Tab 39). Nilssen was never compensated for any of his disclosures to or his work with Motorola (N.R. Mem.12).

Once discussions with Nilssen were terminated, Alling recommended that Motorola communicate with Stevens about his electronic ballast technology. In mid-November 1988 Stevens made a two-day presentation to Motorola executives and engineers in which he demonstrated his own "Super Ballast"—a design that had earlier been licensed to Calmont Technology Industries (M.12(M) ¶¶ 91–92). Motorola decided to enter the electronic ballast industry in February 1989, and it incorporated Lighting for that purpose on March 1, 1989 (M.12(M) ¶ 94; N. 12(N) ¶ 94; M. 12(M) R. ¶ 16). Lighting hired Stevens and executed a Licensing Agreement for the exclusive use of his electronic ballast technology on April 7, 1989 (M.12(M) ¶ 96; M. Ex. Tab 41). Stevens and other Motorola engineers participated in the improvement of electronic ballast design until December 1990, at which time Lighting completed its final design so that it could proceed to production (M.12(M) ¶ 105).

### Nilssen's Illinois Act Claim

Nilssen's Illinois Act claim against Motorola for theft of trade secrets requires that he demonstrate (1) the existence of a protectable "trade secret" (as defined in Act § 2(d)) and (2) Motorola's "misappropriation" (as defined in Act § 2(b)) of that trade secret (*Mangren Research & Dev. Corp. v. National Chem. Co.*, 87 F.3d 937, 942–43 (7th Cir. 1996)). Nilssen suggests that he has proved

---

10. Nilssen wrote to Gunderson on November 9 with this specific compensation proposal:
    (1) one initial payment of $250,000 and
    (2) periodic payments of (i) $125,000 per calendar quarter, plus (ii) 2% on net sales, plus

(iii) one third of Nilssen's technology's "cost-value-advantage" with respect to electronic ballast competition.

each of those elements as a matter of law, while Motorola correspondingly argues that Nilssen's claim fails as a matter of law with respect to each element. This opinion addresses the two elements in turn.

### Existence of a "Trade Secret"

■ Act § 2(d) defines a potentially actionable "trade secret" as:

information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

As a preliminary matter, Motorola suggests that Nilssen's failure to identify a *particular* trade secret is fatal to his claim. As *Composite Marine Propellers. Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir.1992) (per curiam) has warned:

It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets.

Hence Nilssen cannot state a claim for trade secret protection under the Act by simply "producing long lists of general areas of information which contain unidentified trade secrets" (*AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir.1987)). Instead he must articulate protectable trade secrets with specificity or suffer dismissal of his claim (see *Lear Siegler, Inc. v. Glass Plastics Corp.*, No. 81 C 3433, 1987 WL 15749, at *2 (N.D.Ill. Aug. 12)).

■ Motorola's attack on that basis stems from interrogatory answers that Nilssen provided when asked to specify the precise scope of his alleged trade secrets. N. Interrog. Ans. 18 "contends that the information he provided Motorola in the 1987 and 1988 time period, and prior thereto, constituted a package of trade secret and confidential information." On that score this Court has spoken plainly of the legal insufficiency under *AMP* of such a "blunderbuss statement that 'Everything you got from us was a trade secret.' " (*qad. inc. v. ALN Assocs., Inc.*, No. 88 C 2246, 1990 WL 93362, at *3 (N.D. Ill. June 20)).

And Nilssen's other interrogatory responses similarly fail the specificity requirement. N. Interrog. Ans. 24 says:

More particularly, Nilssen's trade secrets consisted of an extensive interwoven combination of a large number of individual elements of information relevant to the technology and business of electronic ballasts as well as to how these elements of information fitted together and how they pertained to Motorola and its prospective participation in the electronic ballast business. These individual elements of information related to and/or included a wide variety of pertinent facts, data, test results, evaluations, graphs, analyses, specifications, drawings, product samples, product requirements, product prototypes, product improvement potentials, circuit diagrams, graphs, types and identities of prospective customers, types and identities of product users, types and identities of key sources, industry standards, industry issues, industry expectations, competitors, revenue potentials, profit projections, social issues and values, patent positions and prospects, etc.; all of which were aimed such as to make Motorola sufficiently understand the significant advantages and appropriateness for it to enter the electronic ballast business.

N. Interrog. Ans. 24 goes on to identify "some" of the confidential information to which that description refers—a 35–element list (including Nilssen's supplemental response) that occupies some five pages.

But other Nilssen submissions to Motorola and to this Court have more specifically identified his claimed trade secrets. N. Mem. 11–20 details a substantial amount of both

technical and nontechnical information [11] that Nilssen assertedly divulged—and that he argues was necessary for Motorola's timely entry into the electronic ballast industry. In terms of technical information relating to the design of electronic ballasts, Nilssen suggests that he disclosed four key circuit elements to Motorola in confidence:

* A series resonant inverter driven by a half-bridge,

* Ballast output capable of driving more than two lamps in a series,

* Means for reducing the cathode heating voltage after lamp ignition and

* A slow-down capacitor used across the inverter output.[12]

And N. Mem. 12–15 and 17–20 substantially narrow Nilssen's identification of nontechnical trade secret information from the 35-element list of N. Interrog. Ans. 24 to a more articulable set. Relying primarily on the expert report of Horace DePodwin ("DePodwin"), Nilssen identified these items of nontechnical information that he claims were—along with Nilssen's technical knowledge of electronic ballast circuits—the "very basis for Motorola's decision to enter the business and its entry strategy" (N. Mem.12, 17–20):

* Information concerning the reliability, cost of manufacture and efficiency of Nilssen's ballast design, often in comparison to existing commercial electronic ballasts,

* Detailed information and analyses of the comparative performance of competitors' ballasts, based on tests Nilssen had conducted,

* Detailed information and analyses of competitive ballasts, including their relative economic advantages and disadvantages,

* Detailed analyses of potential channels for distributing electronic ballasts,

* Information concerning the size and structure of the electronic ballast market, including the prevailing methods of distribution and generally accepted product specifications,

* Estimates of electrical efficiencies that Motorola could expect to achieve with electronic ballast technology in the future, and

* Research and analysis concerning expected profitability following entry into the electronic ballast market and related markets.

This Court finds that level of specificity suffices to withstand Motorola's attack, though not nearly to the extent that Nilssen would have it. Decisions such as *Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1117–18 (Fed.Cir.1996) (applying the Illinois Act) provide generally that a "trade secret" under that statute may include a compilation of confidential business and financial information. And Nilssen has documented each of those nontechnical items, at least to some extent, by referring to appropriate papers from the voluminous record in this case. Similarly, Nilssen's identification of his claimed technical trade secrets—the four key circuit elements of his electronic ballast—is quite specific. In sum, Nilssen's trade secrets as presently articulated are not so lacking in specificity as to require dismissal of his Illinois Act claim.

■ That being said, Motorola correctly urges that Nilssen's Illinois Act claim is also *limited* to trade secrets that are supported by the particular documents that he has

11. In his submissions on the current motions, Nilssen speaks of his disclosures to Motorola in terms of three categories: (1) proprietary information relating to design characteristics of electronic ballasts, (2) proprietary technology and (3) proprietary business information and strategic plan (N. Mem.11–20). In light of how Nilssen's information has been framed by the parties' expert witnesses, however, this opinion will speak only in terms of his "technical" and "nontechnical" disclosures.

12. In his September 24, 1995 amended report, Nilssen's technical expert John C. Clegg ("Clegg") identified a fifth technical feature that Nilssen assertedly disclosed to Motorola in confidence: the use of a current-limiting impedance (a capacitor) in series with the lamp filaments (Clegg Rep. ¶ 50a-f). But Nilssen's motion for summary judgment refers only to the four technical features identified in Clegg's original report (N. 12(M) ¶ 35; N. Mem. 15). This opinion follows Nilssen's own lead by limiting consideration to those first four features.

specified in his memoranda on the current motions. As already said, Nilssen's claimed "definition" of his trade secret package was truly amorphous throughout the discovery process. It was not until Mem. 11–20 that Nilssen even attempted to "discuss in detail" the precise scope of his trade secret claim (see also his R. Mem. 14–15). Motorola properly relied on that first-time-specified particularity when fashioning its own submissions on the current motions, just as this Court has properly relied on Nilssen's statements when deciding these motions.

In that respect *AMP*, 823 F.2d at 1203 has spoken in terms of requiring an identified list of trade secrets "[p]rior to trial," and such cases as *Publishers Resource. Inc. v. Walker–Davis Publications. Inc.*, 762 F.2d 557, 559, 561 (7th Cir.1985), citing and quoting from this Court's opinion in *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd and expressly adopted*, 736 F.2d 388, 393 (7th Cir.1984) clearly teach that a motion for summary judgment is the "functional equivalent" of a trial in which it is asserted that material facts are not in dispute. In responding to Motorola's motion for summary judgment on Nilssen's Illinois Act claim, a motion that rested in critical part on Motorola's contention that the claim should be rejected because of Nilssen's lack of specificity in identifying his purported trade secrets, Nilssen stood in no position to "hold back" on any of the things that he contended met the legal requirement of such specificity.[13] Thus Nilssen's package of alleged trade secrets will be limited at trial to the four circuit elements of his technical claim and to those documents that are expressly identified at his Mem. 11–20 as constituting the basis of his nontechnical claims.

■ To return particularly to Nilssen's assertion of nontechnical trade secrets, Motorola also takes issue with the *type* of information that Nilssen now claims to be protected. As Motorola says, Illinois law does not treat "generalized confidential business information" as a protectable trade secret (*AMP*, 823

F.2d at 1204). So while Nilssen claims trade secret protection for "any proprietary compilation of information" that might have been of value to Motorola (N. Mem.23), it cannot be true that Nilssen's legwork in identifying basic characteristics of the lighting or electronic ballast industries—for example, the size and structure of the electronic ballast market and the industry's main corporate participants—may serve as the foundation for a claim under the Act. Sound commercial policy underlies that rule. For although Motorola may have become "smarter" about the electronic ballast industry as a result of Nilssen's presentations regarding industry fundamentals, any grant of trade secret protection for Nilssen's generalized business information would bar Motorola from entering the business at all if it opted against a business relationship with Nilssen (cf. *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1324–25 (5th Cir.1994)). As this Court has suggested over a decade ago in the somewhat different context of an employee's relationship with a former employer, that approach would require the recipient of generalized business information "to perform a prefrontal lobotomy on himself or herself" to change a business relationship, thus "disserv[ing] the free market goal of maximizing available resources to foster competition" (*Fleming Sales Co. v. Bailey*, 611 F.Supp. 507, 514 (N.D.Ill.1985), quoted in *AMP*, 823 F.2d at 1205).

That does not necessarily mean that *all* of Nilssen's nontechnical information fits into that unprotected category. Instead the documents that may be considered in conjunction with Nilssen's trade secret claim (see Appendix) will be taken into account to the extent that they fit into the class of protected financial information recognized in such cases as *Roton Barrier*, 79 F.3d at 1118, or to any other extent that the case law treats such nontechnical materials as entitled to trade secret protection. Unfortunately the all-or-nothing nature of both sides' presentations has made it impossible for this Court to be more precise—and it is not prepared to scour

---

**13.** See Appendix for an expanded treatment and explanation of just which Nilssen-designated documents qualify in that regard.

the lengthy record in this matter on its own, in an effort to dismiss or to save individual elements of Nilssen's claim on bases that the litigants have not themselves particularized. Thus while it may be the case that some elements of Nilssen's nontechnical trade secret claim are indeed susceptible to further narrowing along those lines, all that can now be said is that Motorola's motion for a dispositive summary judgment on that basis is denied.

■ As their next battle line on the Illinois Act claim, the parties differ as to what "value" (if any) is to be attributed to Nilssen's trade secrets. Act § 2(d)(1) limits trade secret protection to information that "is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use." So information that is generally known within an industry is not trade secret material (*Mangren Research*, 87 F.3d at 942). *Stampede Tool Warehouse. Inc. v. May*, 272 Ill. App.3d 580, 588, 209 Ill.Dec. 281, 287, 651 N.E.2d 209, 215 (1st Dist.1995) (citation omitted) has further detailed the degree of secrecy necessary to impart "value" for a trade secret claim under the Act:

> In determining whether information is a trade secret, the focus of both the common law and the ITSA [the Act] is on the secrecy of the information sought to be protected. The key to secrecy is the ease with which information can be readily duplicated without involving considerable time, effort or expense.

Significantly, then, Motorola might prove that Nilssen's alleged trade secrets were without value by demonstrating that those secrets were easily duplicable through proper means. Although a number of earlier cases had held to the contrary (see *Goldberg v. Medtronic, Inc.*, 686 F.2d 1219, 1226–28 (7th Cir.1982); *Affiliated Hosp. Prods., Inc. v. Baldwin*, 57 Ill.App.3d 800, 807, 15 Ill.Dec. 528, 534, 373 N.E.2d 1000, 1006 (1st Dist. 1978) ("It is no defense that the design or process in question could have been developed independently and without resort to confidential information")), the rule exemplified by *Stampede Tool* is well-established

today (*Computer Care v. Service Sys. Enters., Inc.*, 982 F.2d 1063, 1072 (7th Cir. 1992)).

To have any opportunity to prevail on his Illinois Act claim, then, Nilssen must first prove that his information was sufficiently secret—in the sense of not being duplicable without "considerable time, effort or expense"—to constitute a "trade secret." Only then does the further "misappropriation" analysis become relevant (*Mangren Research*, 87 F.3d at 942–43). *Hamer Holding Group. Inc. v. Elmore*, 202 Ill.App.3d 994, 1011–12, 148 Ill.Dec. 310, 321–22, 560 N.E.2d 907, 918–19 (1st Dist.1990) (citations omitted) so held when it visited the issue as a matter of statutory construction:

> Plaintiff points out that, by eliminating from the definition of "trade secret" the qualifying clause "not being readily ascertainable by proper means by others," the drafters of the Act intended to eliminate the defense available under the Uniform Act that the information could be developed legally through other means. Plaintiff's argument is unpersuasive, however, because the key to "secrecy" is the ease with which information can be developed through other proper means: if the information can be readily duplicated without involving considerable time, effort or expense, then it is not secret. Conversely, information which can be duplicated only by an expensive and time-consuming method of reverse engineering, for instance, could be secret, and the ability to duplicate it would not constitute a defense. For the foregoing reasons, we agree with the trial court and affirm its holding that since plaintiff's customer list could be easily duplicated, it does not qualify as a "trade secret" under the Illinois Trade Secrets Act.

In light of those standards, the existence of a trade secret under the Act is ordinarily a question of fact, for that inquiry necessarily involves the "factual question of whether the 'secrecy' of the information has been maintained and the ease or difficulty of obtaining the information from other sources" (2 Gregory Upchurch, *Intellectual Property Litigation Guide: Patents & Trade Secrets*

§ 16.02, at 16–17 to 16–18 (1996)). What follows is a statement of the relevant facts supporting each party's motion for summary judgment on that basis, from which—when viewed through the alternate lenses required for such cross-motions—it becomes apparent that this Court cannot decide as a matter of law whether or not Nilssen's alleged trade secrets were of sufficient "secrecy" to be of "value" under the Act.

In the light most favorable to Motorola, each of the four technical elements of electronic ballasts that Nilssen now claims as a trade secret was either known in the industry or used in commercially available ballasts (or both) *before* Nilssen's 1988 disclosure to Motorola. Specifically with regard to each element:

* Many participants in the electronic ballast industry knew before 1988 that a half-bridge inverter driving a series resonant circuit could be used in a ballast (Clegg Dep. at 46). That configuration was disclosed in at least five issued patents [14] (two issued to Nilssen) and was used in commercially available ballasts produced by Fyrnetics and several foreign manufacturers (N. 12(N) ¶ 123; Clegg Report ¶ 16; Lesea Report ¶¶ III,A,1–2).

* In 1988 "everybody under the sun" was attempting to create a ballast capable of driving more than two lamps in a series (Clegg Dep. 150). That configuration was disclosed in at least three patents before 1988 and was used in ballasts sold by XO Industries and Stevens Luminoptics (Lesea Report ¶¶ III,C,1–2).

* As for the concept of reducing cathode heating voltage after lamp ignition, that was so well known in the electronic ballast industry that it had its own name: the "modified rapid start method" (Clegg Dep. 197). That idea was disclosed in at least seven pre–1988 patents and was available in ballasts sold by XO Industries and several foreign manufacturers (Lesea Report ¶¶ III,D,1–2).

* Finally, The technique of using a slow-down capacitor across the inverter output was described in a patent issued to Nilssen in 1987 (Clegg Dep. at 231–32). And Fyrnetics was manufacturing an electronic ballast using that configuration before 1988 (Nilssen Dep. 685).

In the light most favorable to Nilssen, though, each of the four circuit elements was either unknown or underdeveloped and commercially infeasible at the time that Nilssen introduced them to Motorola. Here are the particulars:

* Commercial use of a half-bridge inverter to drive a series resonant circuit was rare as of late 1988 (Clegg Report ¶ 23). Fyrnetics was the only commercial manufacturer of electronic ballasts using series resonant inverter circuits, and that company suffered from high failure rates and a correspondingly small market share of 5% to 8% (*id.* ¶ 19). Only two manufacturers had begun to establish electronic ballasts as reliable (in the face of high market skepticism): Triad/Utrad and EBT, both of whom used parallel resonant inverters (*id.* ¶ 20).

* As of late 1988 there were no commercially available electronic ballasts driving more than two lamps in a series (Clegg Report ¶ 29). That fact is confirmed in an early draft of Alling's Solid State Ballast Report (N. Ex. Tab 14), as well as in a December 14, 1990 speech by Katzir praising Motorola's three- and four-lamp ballasts (N. Ex. Tab 30). So while other firms may earlier have been attempting to drive three or four lamps in a series, Lighting was the first company actually to do so (*id.*).

* As Clegg attests, "the commercial availability in late 1988 of electronic ballasts including means of reducing the heating voltage across the cathodes of the lamps after lamp ignition was highly unusual if not entirely non-existent" (Clegg Report ¶ 38). Alling's Solid State Ballast Report demonstrates that the modified rapid start technique was used by Nilssen

---

**14.** Trade secret protection is unavailable for information disclosed in a patent, as "the grant of a patent automatically constitutes full disclosure of the patented process" (*Rototron Corp. v. Lake Shore Burial Vault Co.,* 712 F.2d 1214, 1215 (7th Cir.1983)).

alone (N. 12(M) ¶ 131; N. Ex. Tab 14, Table 1–2).

* Clegg also says that "[i]n late 1988, the commercial use of a slow-down capacitor across the inverter output to improve ballast performance was either unusual or entirely unknown in the electronic ballast industry" (Clegg Report 146). Fyrnetics, the only firm that had used such technology in an electronic ballast, had gone out of business (Nilssen Dep. at 685).

■ Moreover, Nilssen urges that the *combination* of those four circuit elements (each of them little used—if at all—on an individual basis) was unknown in the field of electronic ballasts in 1988.[15] Under Illinois law a trade secret may exist in the combination of a number of elements of information, even if each discrete element may be found in the public domain (*Computer Care*, 982 F.2d at 1074; *Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.*, 940 F.Supp. 1300, 1305 (N.D.Ill.1996)). As *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 684 (7th Cir.1983) has quoted from *Imperial Chem. Indus., Ltd. v. National Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965):

> [A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination,

affords a competitive advantage and is a protectable secret.

Thus the facts taken in a light most favorable to Nilssen suggest that his package of the four circuit elements was really of special "value," thus constituting a protectable trade secret.[16] Not only does Clegg's report detail the generally-believed commercial impracticability in 1988 of each of Nilssen's four circuit elements (Clegg Report ¶ 116–21, 29–30, 35, 38, 46), but Motorola's own documents include repeated references to the innovativeness and perceived profitability of Nilssen's ballast designs. Alling's Solid State Ballast Report asserts that "the Nilssen technology (Patents) contains some very clever and novel concepts which may be useful in developing a commercially viable ballast" (N. Ex. Tab 14). And a July 25, 1988 report by Gunderson observed that the Nilssen electronic ballast had both an "energy efficiency advantage" over its key commercial competitors and a particularly favorable cost structure in light of its ability to drive four lamps (N. Ex. Tab 19). Finally, the April 1988 report by Bergemann and Elliott estimated a "Nilssen Design [Cost] Advantage" of $4.42 over the Triad–Utrad ballast—the key electronic ballast competitor—and therefore estimated that Nilssen's technology had an estimated net present value of approximately $50 million (N. Ex. Tab 22).

To return to a pro-Motorola view of the facts, however, in that light even Nilssen's "package" of the four identified circuit ele-

---

15. Motorola seeks to refute that in its R. Mem. at 7 and 18 by asserting that an electronic ballast produced by Stevens before 1986 contained all four of those elements. But Motorola's record citations on that score do not support its contention. Although Stevens' report indicates that three of his earlier designs contained at least one of Nilssen's circuit elements, he does not say (or even imply) that any one of those designs contained all four elements (Stevens' Report Part III). And Motorola's reference to Clegg's supposed deposition admission suffers from the same flaw. Clegg testified that a number of Stevens' schematics contained certain elements now claimed as a trade secret by Nilssen, but he did not identify any one schematic as containing each of the four elements in combination (Clegg Dep. 68–71, 180, 185–86, 201–02, 234–35).

16. Motorola attempts at its R. Mem. 18 to make an issue of the fact that Nilssen never "specifical-

ly identified those four circuit elements as a special or unique combination" before the present litigation. But once again from a perspective most favorable to Nilssen, it appears that he did release to Motorola several confidential documents relating to the design of electronic ballasts—including designs for at least two complete prototype ballasts (M.12(N) ¶ 127–28). Nilssen certainly could not claim trade secret protection for the broad category of "electronic ballasts," but through Clegg's report he has identified the specific circuits of his design that were both unknown to the industry and of particular value to the production of a marketable ballast. If Motorola did indeed misappropriate confidential information of that nature, Nilssen has stated a valid Illinois Act claim—even if Nilssen does not show that Motorola misappropriated other (perhaps well-known) aspects of his ballast design.

ments was not sufficiently secret to be of any value in the electronic ballast industry. Significantly three of those four elements—the series resonant inverter driven by a half-bridge, the means for reducing cathode heating voltage after lamp ignition and the slow-down capacitor used across the inverter output—were disclosed to the public in Nilssen's United States Patent No. 4,677,345 issued June 30, 1987 (Stevens Report § III). Additionally, Motorola's expert Bruce Den Uyl ("Den Uyl") identifies a review by Fyrnetics that found (1) that "Nilssen's ideas offered no competitive advantage" and (2) that other products on the market were "similar or identical" to ballasts produced using Nilssen's technology (Den Uyl Report § IV.A.1). Lesea concludes more generally that "[t]he allegedly confidential technical information provided by Nilssen was already generally known in the fluorescent lighting ballast industry" (Lesea Report § II.A).

That same conclusion as to the inappropriateness of summary judgment on either side's motion applies to Nilssen's asserted nontechnical trade secrets. As before, a Janus-like dual perspective must be adopted in the analysis.

In a light most favorable to Motorola, the facts reflect that Nilssen's cost, business and marketing information was both readily known in the industry and easily replicated. Even apart from the fact that Nilssen cannot expect to look to all (or even close to all) of the 35 elements to which he refers at N. Interrog. Ans. 24 (see Appendix), Motorola's expert Ailing specifically rebuts the value of each of those 35 elements, concluding generally that "the information provided by Nilssen to Motorola was available in and/or known to the electronic ballast industry during the relevant time period" (Ailing Report ¶ 3.0). Den Uyl similarly concludes that "[v]irtually all of [Nilssen's] nontechnical information was generally known within the industry at that time" (Den Uyl Report § VI,A,2). And as for Motorola's ability to accumulate the relevant nontechnical information without Nilssen's assistance, Ailing concludes in his Report ¶ 3.1.1:

> Motorola had numerous employees who were familiar with the ballast industry and knew much or all of the information needed to enter the electronic ballast industry. Motorola, as a large user of lighting and ballasts in their own facilities, could have called on their own captive architects, engineers, or facility managers for information.... In short, Motorola had considerable expertise in-house regarding the lighting and ballast industry. In addition, at the appropriate time, it hired industry consultants and experts independent of Nilssen to obtain the appropriate information relative to the electronic ballast industry.

As Motorola would have it, Gunderson and Katzir's 1988 research—in which the two met with 96 potential customers and industry participants—strikingly demonstrates Motorola's ability to act in that regard (M.R. Mem. 10; Gunderson Aff. ¶ 4).

But on the other side of the coin, from a pro-Nilssen stance it seems likely that at least some of his nontechnical information was secret and of value in the electronic ballast industry. Unfortunately the manner in which Nilssen has made his Rule 56 presentation makes it impossible to reach a conclusion in that respect. It will be recalled that he relies on everything but the kitchen sink (his 35 elements) as a purportedly synergistic combination. And on that premise Nilssen's expert DePodwin opines that Nilssen's nontechnical information was both secret and proprietary, with each element fitting into one of three categories: (1) information that "originated and [was] held closely by Nilssen," (2) "information associated with judgments made by Nilssen over time" and (3) "some material which, while arguably public in certain constituent parts, when taken together, constituted proprietary property of value because of the way in which those components were combined and/or presented" (DePodwin Report ¶ 12). Further, on that same premise Nilssen's contribution of proprietary nontechnical information was critical for prompt entry into the electronic ballast industry—particularly for a firm entering the business as late into the product life cycle as was Motorola (id. ¶¶ 36, 58):

The information in question is of a kind that is both basic and critical to entry decisions in any industry setting, i.e., actual and/or projected production costs, performance, and market value of one's own proposed product line—or a product line essentially similar—as compared to the products with which it would have to compete.

Finally (and again subject to the same caveat), Nilssen's collection was not "easily duplicable," for Motorola was assertedly *incapable* of properly assessing its entry into the industry without Nilssen's assistance (*id.* ¶ 57):

Our evaluation of the record also confirms that, absent Nilssen's contributions, Motorola lacked the resources required to properly assess entry into the electronic ballast business, much less get such a business off the ground. The company's lack of experience in the lighting industry, coupled with the more specific deficits noted above, made Nilssen's contributions even more essential, and thus even more valuable.

It must be emphasized, though, that all of this must be revisited in light of the considerably smaller package of nontechnical grist for Nilssen's trade secret mill that is available to support that facet of his claim (see Appendix). Unless Nilssen is able to muster a like showing of "economic value" (within the meaning of Act § 2(d)(1)) for that more limited combination of secret nontechnical information, that portion of his claim will fail as a matter of law. And because the burden of proof in that regard rests on him, he must provide input on that score (in conformity with Rule 56(e) and GR 12(M)) on or before May 5, 1997—failing which this opinion will be supplemented by a determination that Nilssen has suffered an adverse judgment on that part of his Illinois Act claim for failure of proof of a necessary element of the claim.

In summary, issues of fact now exist in both directions as to whether Nilssen's alleged technical and nontechnical trade secrets were sufficiently secret to have been of "value" to Motorola. That conclusion alone is sufficient for the conclusive defeat of Nilssen's motion for summary judgment, for the facts taken in a light most favorable to Motorola demonstrate that Nilssen had neither technical nor nontechnical trade secrets to be protected under the Act. But because the facts taken in a pro-Nilssen light at least presently create the reasonable inference that Nilssen did have protectable trade secrets of "value," summary judgment for Motorola on that basis is also inappropriate (at least for the time being).

*"Misappropriation" of a Trade Secret*

This opinion now turns to Motorola's attack on the second essential component of Nilssen's Illinois Act claim: that Motorola "misappropriated" a protectable trade secret of Nilssen (Act § 2(b); *Mangren Research,* 87 F.3d at 943). For even if Nilssen held valuable trade secrets regarding the production of a marketable electronic ballast, Motorola would still be entitled to summary judgment if it could demonstrate as a matter of law that Motorola did not "misappropriate" any of those secrets in the statutory sense.

*American Antenna Corp. v. Amperex Elec. Corp.,* 190 Ill.App.3d 535, 538, 137 Ill.Dec. 417, 420, 546 N.E.2d 41, 44 (2d Dist.1989) teaches:

A misappropriation of trade secrets occurs when a person acquires or discovers a trade secret by improper means or disclosures or uses a trade secret in breach of a duty of confidentiality imposed on him by the nature of his relationship with the owner of the trade secret or reposed in him by the owner in disclosing the information, and the owner of the trade secret is damaged by this improper acquisition, disclosure or use.

Thus a few moments should be spent on identifying the scope of Motorola's duty of confidentiality before tackling the question whether any misappropriation took place in violation of that duty.

■ While an express confidentiality agreement may certainly suffice to define the duty of confidentiality necessary for action under Act § 2(b)(2)(B)(II), the existence of such an agreement is not a prerequisite to such an action (*Hexacomb Corp. v. GTW Enters., Inc.,* 875 F.Supp. 457, 464 (N.D.Ill. 1993)). Rather a duty of confidentiality may be implied from the circumstances surrounding the parties' relationship (*Rockwell*

*Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir.1991)).

Here the precise character of the relationship between Nilssen and Motorola changed several times during the 1986–88 period. Before September 4, 1987, when the parties executed the 1987 Agreement, they had no written understanding that Motorola would maintain the confidentiality of information that was relayed by Nilssen. Of course Nilssen first approached Motorola about opportunities in the electronic ballast industry in 1982, and he now contends that he conveyed proprietary information to Motorola before the 1987 Agreement—particularly during his several meetings with, and correspondence that he sent to, Motorola officials during his "second pitch" in 1986. In addition, the 1987 Agreement provided that Motorola's "evaluation [was] to be completed within two months from the effective date of this Agreement" (M. Ex. Tab 16), and Nilssen continued to provide Motorola with information well beyond that two-month period (M.12(N) ¶ 21). It was not until September 27, 1988 that the parties entered into the 1988 Agreement.

Nilssen's position is that Motorola was under a duty to maintain the confidentiality of his disclosures—whenever made—at all times relevant to this litigation. As for his pre–1987–agreement disclosures, Nilssen suggests that they were sufficiently limited and were communicated for the proper purpose (marketing his product) so as to fit into the category protected by a corresponding duty of confidentiality recognized in cases such as *Rockwell Graphic*, 925 F.2d at 177. Nilssen also points to additional circumstances surrounding his pre–1987–Agreement disclosures that might permit an inference that a confidential relationship then existed. For example, Nilssen's February 7, 1986 letter to Schulmeyer said (M. Ex. Tab 7):

> So, Mr. Schulmeyer, I would like to meet with you to discuss the possible partic-

ipation by Motorola in the business of electronic ballasts. However, for me to be able to communicate effectively with you, it would be necessary for Motorola to accept my technical disclosures in confidence.

And Nilssen seeks to complete the picture by arguing that an implied duty of confidentiality persisted throughout the periods expressly covered by the 1987 and 1988 Agreements (N.R. Mem.18).

■ All of that, however, accords insufficient weight to the express contractual arrangements that ultimately governed the parties, relationship. It must be recognized that the Illinois Act does not purport to limit or override an express contractual arrangement governing the confidential exchange of proprietary information (see Act § 8(b)(1)). Instead, because a confidentiality agreement is a valid contract enforceable according to its terms (*Andrea Dumon, Inc. v. Pittway Corp.*, 110 Ill.App.3d 481, 488, 66 Ill.Dec. 148, 153, 442 N.E.2d 574, 579 (1st Dist.1982)), Illinois law precludes the finding of "[a]ny implied duty of nondisclosure" that "would directly contradict the express agreement of the parties" (*id.*). Thus a contract that defines the degree of confidentiality among the parties also serves to establish—and to define—the duty of confidentiality required to underpin an Illinois Act claim (*Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1118 (Fed.Cir.1996)).[17]

■ In light of those standards, the terms of the 1987 and 1988 Agreements preclude a finding of any implied duty of confidentiality for Nilssen's disclosures not expressly reduced to writing and marked "confidential." As set out earlier, the 1987 Agreement established the exclusive mechanism by which Nilssen might establish his disclosures as confidential: He had to memorialize and transmit them in writing and mark them "confidential" or "proprietary" (M. Ex. Tab 16). And although the 1987

---

17. It should be obvious, but it is worth pointing out, that an agreement that permits a contracting party to attach a "confidential" label to a document (for example) causes that designation to serve as a necessary (but not as a sufficient) condition of a possible trade secret claim regarding that document. That is, the other party to

the agreement is not obligated to accept the unilaterally applied "confidential" label as satisfying all of the statutory standards for trade secret treatment, but the party choosing to apply or not to apply the label cannot later claim confidentiality for unlabeled material.

Agreement called for Motorola to evaluate Nilssen's technology for only a two-month period, the parties thereafter conducted themselves as if the terms of that agreement governed Nilssen's continuing 1987–to–1988 disclosures (M.12(M) R. ¶ 4; M.R. Mem. 6).

Then (and perhaps most critically) the 1988 Agreement unquestionably shows that the parties' contractual obligations—rather than any implied-at-law duties—governed the confidential relationship. That Agreement begins with this statement (M. Ex. Tab 31, emphasis added):

> This is to confirm the agreement we reached *in regard to information you have disclosed,* or will disclose, *to Motorola.* . . .

It goes on to state (*id.* ¶ 3, emphasis added):

> We also agreed to discuss *the confidentiality of information that Motorola has previously received from you* in regard to electronic ballasts. Our goal is to more specifically identify what it is that should be treated as confidential.

And the very next communication between the parties—Gunderson's October 3, 1988 letter to Nilssen—reflects precisely the agreement that emerged from that discussion (M. Ex. Tab 32):

> This is to confirm the various "to-do's" that resulted from our meeting with you last

Wednesday, and also to confirm some of the conclusions we reached.

Ole's [Nilssen's] "to-do's":

> . . .

> 2. Review your previously-submitted documents and determine whether any of them should have been stamped as "confidential". Our intent is to more specifically identify the information that you regard as confidential.

Nothing in the record as spoken of by the litigants indicates the extent to which Nilssen did or did not implement that "to-do" by a post–1988–Agreement markup of his documents as "confidential." But that is not important—what is significant is that he was afforded the full *opportunity* to do so, and he cannot now contend that the trade secret concept extends to any *implied* duty stemming from his delivery to Motorola of any information (at any time during the parties' relationship) that he did not himself reduce to written form and stamp "confidential." In short, this Court holds,[18] based on the 1987 and 1988 Agreements, including the parties' joint reading of the 1988 Agreement as reflected in the October 3 letter (M. Ex. Tab 32) just a few weeks later, that any disclosure that Nilssen believed to be proprietary—including *previous* disclosures that had not been so marked—had to be in written form and stamped "confidential." [19] In ac-

---

**18.** Construction of the parties' written agreements is of course a question of law for this Court and not one of fact for the jury (see, among the innumerable cases so holding, *Liccardi v. Stolt Terminals (Chicago), Inc.,* 283 Ill.App.3d 141, 147, 218 Ill.Dec. 666, 672, 669 N.E.2d 1192, 1198 (1st Dist.1996)). It should perhaps be made explicit, as is implicit in the entire discussion in this opinion, that this Court finds the agreements unambiguous in the respects discussed here—again a question of law for this Court (*id.* at 149, 218 Ill.Dec. at 673, 669 N.E.2d at 1199).

**19.** Any possible contention by Nilssen that the "to-do" reference in the October 3, 1988 letter to "previously-submitted documents" somehow left room for an implied duty of confidentiality on Motorola's part as to matters that had been disclosed by Nilssen in *non*-documentary form would have to be rejected out of hand. As the express provisions of the 1988 Agreement made doubly clear, Motorola was then concerned (as was Nilssen) that any possible ambiguity in the parties' relationship stemming from its several

fits and starts over the preceding few years (and from Nilssen's repetitive pushing, during that period, of his ideas for adoption by Motorola—at a price) should be eliminated. It would be really absurd to suggest that such mutual concern translated itself into giving Nilssen the opportunity to take a fresh look solely at documents embodying disclosures that were first made only *after* the 1987 Agreement had become effective (remember that there was no really arguable ambiguity that needed clarification as to those documents, for the 1987 Agreement specifically spelled out the only way in which Nilssen could claim confidentiality as to any communication), while at the same time leaving wide open—and thus leaving Motorola vulnerable to all claims stemming from—any disclosures that Nilssen had made earlier in unwritten form, or that he had made in any documents not identified by him with a "confidential" designation. Any such indeterminate resolution of the arguably undefined aspects of the parties' relationship, while "resolving" only an already-resolved aspect, would be totally illogical—it would leave an ex-

cord with such decisions as *Andrea Dumon,* 110 Ill.App.3d at 488, 66 Ill.Dec. at 153, 442 N.E.2d at 579, then, this Court finds that Motorola was under no duty to maintain the confidentiality of any of Nilssen's disclosures (whenever made) that were not so marked.[20]

██ With this opinion having thus fleshed out the potential scope of any duty on Motorola's part (or, more precisely, the standard for identifying that potential scope), it is time to turn to the "misappropriation" issue. In that respect, even on the premise of a possible duty under the Act not to use or to disclose Nilssen's trade secrets, Motorola further argues that it did not "misappropriate" any trade secret. To that end Motorola points to the terms of the 1987 Agreement, which specifically permitted Motorola's use of Nilssen's confidential information for "evaluation purposes" (M. Ex. Tab 16). Motorola urges that it did no more than to evaluate (and then to return) Nilssen's information.

But the required pro-Nilssen characterization on Motorola's Rule 56 motion could reasonably imply that Motorola's use of Nilssen's trade secrets went well beyond evaluation. Clegg's report details his opinion "that Motorola got [from Nilssen] the idea of and motivation for entering the electronic ballast business using" each of Nilssen's four circuit elements (Clegg Report ¶ 28 (series resonant inverter driven by a half-bridge); *id.* ¶ 36 (ballast output driving more than two lamps in a series); *id.* ¶ 43

(means of reducing the voltage across the cathodes of the lamps after ignition); *id.* ¶ 50 (slow-down capacitor across the inverter output)). Indeed, Clegg says that Motorola's circuit design is so similar to Nilssen's that it copied at least one drawback (*id.* ¶ 42):

> Based on my experience, at least one striking similarity between Nilssen's means of reducing the heating voltage across the lamp after ignition and Motorola's means of reducing the heating voltage across the lamps after ignition is a drawback common to each; namely, neither circuit provides for guarding against the dc-current bias of the transformer as the result of one cathode losing its ability to emit electrons, in turn causing a net electron imbalance to occur in the transformer. It is my opinion that this is the result of copying by Motorola of Nilssen's designs.

Similarly, DePodwin ¶ 27 attests that Nilssen's alleged nontechnical trade secrets were used in the implementation of Lighting's new business: "[m]uch of Motorola's entry strategy, concepts, and materials derive from Nilssen."[21]

Motorola argues that it could not have misappropriated Nilssen's technical trade secrets because Lighting's ballast design team did not have access to Nilssen's information. In that respect Motorola says that Stevens and a group of Lighting engineers—none of

---

ception wider than the proverbial space through which a Mack truck of liability could be driven, while "closing up" an already-closed narrow rule. Instead the hypothetical contention discussed in this footnote really points up the fact that the fairest reading of the 1987 Agreement is that any unwritten disclosures—past *or* present—as to which Nilssen intended to claim confidentiality had to be documented or reduced to writing and so marked by him *after* the 1987 Agreement was signed, so that Nilssen was not free to urge that the amorphous set of unwritten communications that antedated that signing and that he did not take the opportunity to designate as "confidential" or "proprietary" were to be treated as having that status. And as to any pre–1987–Agreement written disclosures that Nilssen wanted to have treated in that fashion, the October 3 letter implementation of the 1988 Agreement gave him a full opportunity to do so—hence any document that then remained unlabeled is not entitled to potential trade secret status.

**20.** This opinion leaves for future consideration what effect the various addenda that Nilssen attached to his disclosures—including the Addendum to Disclosure in his September 23, 1988 letter to Gunderson—might have on Motorola's duty of confidentiality. That issue has been addressed by the parties only in factual terms (*see* N. 12(N) ¶ 43; M. 12(M) R. ¶ 5; N.R. Mem. 4), and neither side has made an effort to identify which of Nilssen's alleged confidential disclosures might be included or excluded from trade secret protection based on the effect of those documents.

**21.** As before, it should be recognized that DePodwin's opinion on that score cannot be taken at face value, resting as it does on Nilssen's global-package approach to his claimed nontechnical disclosures. What this opinion has said earlier about revisiting that facet of Nilssen's claim applies here with equal force.

whom had access to Nilssen's documents or designs—began work in the fall of 1989 based on a preliminary design of Stevens' Super Ballast.[22] Motorola further says that Gunderson—the only Lighting employee to whom Nilssen had earlier delivered files— was given responsibility for testing Lighting's prototypes and competitors' ballasts, but that he had no role in selecting circuit configurations (M. Mem. 14–15; M.R. Mem. 7).

Again a view from Nilssen's perspective leads to the very different inference that Nilssen's designs *were* incorporated into Lighting's ballast. Nilssen disclosed to Motorola "a massive amount of proprietary information" (M.12(M) R. ¶ 10), and Clegg's report details precisely which of those circuits he believes to have been incorporated into Motorola's design. Further, a reasonable jury might find that the Lighting decisionmakers who had access to Nilssen's designs incorporated those secrets into Lighting's ballast. Cases such as *Roton Barrier*, 79 F.3d at 1118–19 teach that the placement of key employees in a position where they might assimilate a trade secret permits an inference of misappropriation. Motorola admits that Katzir was centrally involved in the design of Lighting's ballast, and discovery has uncovered several of Nilssen's confidential disclosures in Katzir's files (N. Ex. Tab 39). Additionally it appears that Gunderson attended a series of meetings with Lighting's engineers at which its commercial ballast design was ultimately approved (N. 12(N) Supp. ¶ 19; Stephens Dep. 60, 64).

Importantly, it is not necessary to Nilssen's Illinois Act claim that Motorola have copied Nilssen's ballast design *exactly*. As

*Mangren Research*, 87 F.3d at 944 quoted from *In re Innovative Constr. Sys., Inc.*, 793 F.2d 875, 887 (7th Cir.1986):

> [T]he user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret.

Indeed, Motorola might face liability for misappropriation under ITSA even if it used Nilssen's trade secrets "only to demonstrate what pitfalls to avoid" (*Affiliated Hosp. Prods.*, 57 Ill.App.3d at 807, 15 Ill.Dec. at 534, 373 N.E.2d at 1006).

In sum, the record demonstrates that a reasonable jury might find that Motorola misappropriated both technical and nontechnical trade secrets from Nilssen. Thus Motorola cannot prevail via summary judgment on Nilssen's Illinois Act claim.

### Nilssen's Common Law Claims

■ Act § 8(a) provides:

> [T]his Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.

As *Composite Marine Propellers*, 962 F.2d at 1265 (citation to Act § 8(a) omitted) has explained:

> Yet Illinois has abolished all common law theories of misuse of such [secret] information. Unless defendants misappropriated a (statutory) trade secret, they did no legal wrong.

Nilssen's claims for breach of confidential relationship and quantum meruit/implied

---

22. In a separate March 10, 1997 motion Nilssen moved to strike the portions of Stevens' and Gunderson's affidavits that say Lighting's engineers had no access to Nilssen's information when they were designing the Lighting ballast. Specifically, Nilssen challenges Stevens' and Gunderson's competence to make such statements under Rule 56(e), which requires that an affidavit be "made on personal knowledge" and that it "set forth such facts as would be admissible in evidence." That motion is denied. As Motorola has argued in response to the motion, Stevens and Gunderson are among the most knowledgeable individuals at Motorola regarding

Lighting's ballast design efforts, and they are certainly competent to testify as to their understanding of the input used when designing the Lighting ballast. And although Nilssen has identified portions of the record that may provide appropriate limits to each affiant's statements— Stevens, by the relevant time period of his involvement in design process (apparently through April 1990) and Gunderson's by his limited reference at Gunderson Aff. ¶ 7 to his knowledge of the whereabouts of only one copy of Nilssen's documents—Nilssen has identified no statement made by either affiant to which he was incompetent to testify.

contract/unjust enrichment are simply common law claims for the alleged misappropriation of trade secrets. As stated in Act § 8(a) and as other courts have squarely held, both types of claims are preempted by the Act (*Precision Screen Machs. Inc. v. Elexon, Inc.*, No. 95 C 1730, 1996 WL 495564, at *4 (N.D.Ill. Aug. 28) (breach of confidential relationship); *Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F.Supp. 316, 321 (N.D.Ill.1995) (unjust enrichment)). Motorola prevails on its summary judgment motion as to those two claims.

## Conclusion

As to Nilssen's Illinois Act claim, genuine issues of material fact exist as to (1) whether or not Nilssen's alleged trade secrets were sufficiently secret to be of value, (2) whether or not Motorola owed a duty to Nilssen to maintain the confidentiality of various of his disclosures and (3) whether or not Motorola misappropriated any of Nilssen's alleged trade secrets. Both Rule 56 motions are denied as to Nilssen's Illinois Act claim.[23]

Nilssen's other claims at common law—for breach of confidential relationship and on theories of quantum meruit/implied contract/unjust enrichment—are preempted by the Illinois Act. Motorola is therefore entitled to a judgment as a matter of law as to those claims, which are accordingly dismissed. Nilssen's motion for summary judgment as to those claims is of course denied.

Finally, this action is set for a status hearing at 8:45 a.m. May 12, 1997. At that time counsel for the parties should be prepared to discuss the procedural steps that are required to conduct any revisiting of matters called for by this opinion and—most importantly—that are required to lead to a trial at the earliest possible time.

**23.** No determination is made at this time as to whether any action other than the denial of the current motions is appropriate by reason of the fact that this entire trip was really unnecessary under the circumstances (see n. 4).

**1.** That set includes N. Exs. Tab 18 and Tab 20(G), (P), (U), (DD), (NN), (M57263) and (II).

## *Appendix*

As expressed in this opinion's discussion of the scope of any potential trade secrets for purposes of Nilssen's Illinois Act claim, he is limited to relying on the four circuit elements of his technical claim and on the documents identified at his Mem. 11–20 that assertedly constitute the basis of his nontechnical claims. This Appendix has been added to amplify the point that the precise scope of that latter category may still be a basis for dispute.

Motorola has argued at its R. Mem. 23 that Nilssen's non-technical claims should be limited to the few exhibits that Nilssen has specifically identified in his memorandum: a total of seven documents.[1] From the very of the briefing process where cross-motions under Rule 56 are at issue—the filing of simultaneous memoranda in support of each party's motion, followed by the simultaneous filing of memoranda responding to the other side's motion—Nilssen did not have the opportunity to address that argument in Motorola's responsive memorandum. But even without such input from Nilssen, this Court's examination of his original filing reveals that his description of his trade secrets at N. Mem. 11–20 had included not only the references to those seven documents but also a number of particularized references to several paragraphs of DePodwin's expert report.[2]

It might therefore be possible for Nilssen to suggest that documents marked "confidential" and specifically identified in each of those enumerated paragraphs should properly also be considered for purposes of Nilssen's non-technical trade secret claim. But this Court must express a degree of skepticism as to any such more expansive interpretation for two reasons:

1. Each of the exhibits to which Nilssen has referred specifically at N. Mem. 11–20 (see n. 1 to this Appendix) is also

**2.** N. Mem. 11–20 also includes references to several of Nilssen's interrogatory answers, which themselves mention several of Nilssen's confidential disclosures. For the reasons stated in the text of this opinion, however, Nilssen is precluded for Rule 56 purposes from relying on his simple mention of those documents in his Interrog. Ans. 18 and 24.

expressly mentioned among the larger set of documents that are identified in the corresponding paragraphs of DePodwin's report. Hence any reading that treats Nilssen's generalized citation to that report as though it were somehow a shorthand vehicle for making specific reference to all of the documents that were mentioned in the report itself would render Nilssen's separate and particularized specification of just those seven documents at N. Mem. 11–20 a total redundancy. There had to be some rational predicate for Nilssen's singling out of those seven documents alone, and Motorola's contention certainly provides a logical one. Rather than finding Nilssen's specific references to particular documents an irrelevancy, this Court is inclined to find that those references properly define the scope of Nilssen's non-technical trade secrets.

2. As Fed.R.Evid. 703 makes plain, the facts or data that form the basis of an expert opinion need not themselves be admissible into evidence. This Court is particularly sensitive to the growing concern that Fed.R.Evid. 703 may too often be used as an inappropriate "back door" for the presentation to the factfinder jury, through expert testimony, of otherwise inadmissible evidence (as chance would have it, the April 14–15, 1997 meeting of the Judicial Conference's Advisory Committee on the Rules of Evidence, of which this Court is a member, took occasion to devote a material part of its discussion to that very problem and any potential solutions—such as the issuance of judicial orders limiting such presentations, or even the adoption of an amendment to Fed.R.Evid. 703). In this case it appears simply inappropriate for Nilssen to contend that he relied on the mere mention of a document in the course of an expert's opinion—a document that might or might not itself be admissible by the very terms of Fed.R.Evid. 703 (or that might be withheld from the jury under Rule 403)—as somehow providing a self-explanatory definition of the scope of his claimed non-technical trade secrets.

As stated earlier in this Appendix, Nilssen has not yet had an opportunity to respond to Motorola's contention. But because of its logical force, this Court is prepared to accept it unless Nilssen provides a persuasive predicate for not doing so. Nilssen is granted until May 7, 1997 to submit to this Court a statement of his position as to why he should not be so limited. Absent such a submission Motorola's proposed limitation will be accepted, while if Nilssen tenders such a submission this Court will consider the appropriate next step on the subject.