2023 IL App (1st) 211015-U

No. 1-21-1015

Filed May 4, 2023

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| NAV CONSULTING, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CH 5198 |
| | ) | |
| SUDRANIA FUND SERVICES | ) | |
| CORPORATION and NILESH SUDRANIA, | ) | Honorable |
| | ) | David B. Atkins, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Lampkin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) Dismissal of tortious interference with a contract claim affirmed as plaintiff failed to plead resulting damages and the claim is otherwise preempted by the Illinois Trade Secrets Act. (2) Dismissal of trade secret misappropriation claim affirmed when plaintiff made insufficient allegations that it has protectable trade secrets, that any trade secret was acquired by improper means, or that any trade secret was being used or would be inevitably disclosed. (3) Dismissal with prejudice affirmed when plaintiff failed to tender proposed amended complaint and had prior opportunity to replead.

¶ 2    Plaintiff, NAV Consulting, Inc. (NAV), sued a former NAV employee, Nilesh Sudrania,

and the company he started, Sudrania Fund Services Corporation (SFS) (collectively, defendants),

alleging that they were competing unfairly. NAV's initial complaint included claims of tortious interference with a contract, trademark infringement, unfair competition, and deceptive trade practices. NAV later filed an amended complaint, adding claims of trade secret misappropriation and civil conspiracy. The circuit court dismissed three counts of NAV's amended complaint pursuant to the defendants' motion to dismiss. After voluntarily dismissing the remaining counts, NAV appealed.[1]

¶ 3                                    I. BACKGROUND

¶ 4        NAV provides accounting services for hedge funds.[2] The company has a contract with Back Office, a company located in Jaipur, India, to perform certain accounting tasks.

¶ 5        Sudrania began working for NAV in 2001. Through the training and experience he received from NAV, Sudrania became well-versed in the hedge fund accounting industry. NAV promoted him to head a department and considered him a "key employee." Through his 15-year tenure with the firm, Sudrania is, according to NAV, "intimately familiar with NAV proprietary, confidential, or trade secret information."

¶ 6        Sudrania resigned from NAV in 2015 and started his own hedge fund accounting business, SFS, in 2016. Like NAV, SFS contracts with an Indian company, Sudrania Software LLP (SSLLP), for certain accounting tasks.[3] According to NAV's amended complaint, "as of early 2020, Sudrania ***[had] established a business to compete with NAV by replicating the business

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] "A hedge fund is a limited partnership of private investors whose money is managed by professional fund managers who use a wide range of strategies, including leveraging or trading of non-traditional assets, to earn above-average investment returns. Hedge fund investment is often considered a risky alternative investment choice and usually requires a high minimum investment or net worth, often targeting wealthy clients." Investopedia, *What is a Hedge Fund?* (visited April 21, 2023) <investopedia.com/terms/h/hedgefund.asp>.

[3] Neither Back Office nor SSLLP are parties to this suit. The record indicates litigation is ongoing between the two companies in India regarding former Back Office employees working for SSLLP.

model and structure NAV utilizes using NAV *** proprietary, confidential, or trade secret information."

¶ 7    In the Spring of 2020, SFS hired Amit Arora, a NAV senior account manager, who also had a lengthy tenure at the company. Two years before he left NAV, Arora signed an employment contract that contained several noncompetition provisions, imposing certain restrictions if he were to leave the company. Among other restrictions, the contract barred Arora from working, in any capacity, for any entity that provides hedge fund accounting services for a period of two years. The contract also barred Arora from soliciting any NAV client for two years.

¶ 8    Apart from Arora's departure to SFS, three employees, Ravi Kant Modi, Abhay Sharma, and Shubham Godha, resigned from Back Office and went to work for SSLLP in Spring 2020.

¶ 9    NAV's initial complaint asserted four claims against Sudrania and SFS. The defendants filed a motion to dismiss and, by agreement, NAV later filed a verified amended complaint. NAV's amended complaint asserted six counts: (1) tortious interference with Arora's employment contract, (2) trade secret misappropriation, (3) civil conspiracy, (4) trademark infringement, (5) unfair competition, and (6) a violation of the Uniform Deceptive Trade Practices Act (815 ILCS 510/1 *et seq*. (West 2020)). We describe only the first two, as they are the counts at issue in this appeal.[4]

¶ 10    NAV claimed that, by hiring Arora, the defendants intentionally induced him to breach his employment contract with NAV. Arora's contract prohibited him from working for a competitor like SFS and his employment with SFS "encourag[es] him to use and disclose NAV proprietary, confidential, or trade secret information." NAV claims "on information and belief" that Arora

---

[4]NAV advances no argument on appeal regarding the dismissal of its civil conspiracy claim. Points not argued in an appellant's initial brief are forfeited. *In re Estate of Crawford*, 2019 IL App (1st) 182703, ¶ 22 (citing Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018)).

breached his employment contract with NAV by accepting employment with a direct competitor and that Arora is using and disclosing NAV's confidential information. NAV states that it does not know the full scope of Arora's breach, "in part because information concerning the same is in the possession of Arora and Defendants." Nevertheless, NAV alleges that Arora has used NAV's confidential pricing and profit margin information to solicit existing NAV customers.

¶ 11     In its misappropriation claim, NAV set forth a nine-point "unlimited" list of what it labeled "NAV Trade Secret Information." The list read as follows:

"a.     information regarding NAV's existing customers, including (i) the nature of the services NAV provides the customers; (ii) the projected duration of NAV's relationship with the customers; (iii) the contract status of NAV's customers, including expiration dates; (iv) the needs of NAV's customers and prospects for NAV to expand its business with those customers; (v) new markets or new domiciles where NAV's existing customers plan to do business; (vi) key contacts within customer organization; and (vii) what terms in NAV's customer contracts are negotiable and which terms are not, as well as historical information regarding customer contract negotiation;

b.     information regarding pricing of NAV's products and services, including (i) NAV's profit margins; (ii) NAV's break-even prices; (iii) NAV's pricing philosophy and practices; and (iv) NAV's historical and strategic pricing, including but not limited to the pricing knowledge Arora used when he solicited NAV's existing customers while he was working for SFS;

c.     information regarding the processes and controls NAV employs in servicing its customers, including process measures, additional steps, algorithms, rules, formulas, tools, checks, checklists, and procedures aimed at increasing efficiency, preventing errors,

ensuring integrity of the final product or detecting and preventing fraud (collectively, "Controls");

d.      information regarding process Controls, including but not limited to those known and used by Modi as an Executive Manager in Fund Accounting at Back Office;

e.      information regarding specialized Controls involving complex accounts, including but not limited to those used by Sharma as a Senior Accounts Executive in the Portfolio Services department at Back Office;

f.      information regarding Controls pertaining to monthly fee calculations, including but not limited to those known and used by Godha as a Senior Accounts Executive in the Monthly Team in the Fund Accounting Department at Back Office;

g.      information regarding plans for expansion of NAV's product and service offerings, including (i) the identification of new areas of business for NAV; (ii) the identification of opportunities to fill gaps in NAV's list of products and service offerings; (iii) the status of NAV's consideration or action toward business expansion; (iv) contemplated strategic partnering within industry; and (v) identification of terms with proposed or actual vendors for work in new product and service offerings;

h.      information regarding processes, training and know-how required for handling a higher volume of clients per account manager than anywhere else in the industry; and

i.      information regarding NAV's prospective customers (such as fund managers and investors) and parties which are in the sphere of influence of potential customers (such as attorneys, accountants and brokers), which information includes the name, contact information, date or dates of contact, the outcome of such contacts and next steps to take in order to procure the new business."

¶ 12        NAV asserted that its trade secret information "is sufficiently secret such that NAV derives economic value, either actual or potential, for it not being generally known to other persons, such as SFS or SSLLP, who can obtain economic value from its disclosure or use." The company maintains the confidentiality of its information by various means. Employees, customers, and vendors are required to sign confidentiality agreements. Computer networks are password protected and employees can access only the portions of NAV's systems that are necessary for their duties. In addition, NAV's computers lack ports that could be used to download data to an external device. By company policy, employees are prohibited from sending confidential information by electronic mail to personal accounts or other parties without prior management approval. During the COVID-19 pandemic, NAV implemented measures to protect its information while employees worked from home. NAV also requires Back Office and its employees to abide by similar measures.

¶ 13        According to NAV, by SFS hiring Arora and SSLLP hiring Modi, Sharma, and Godha, the defendants induced each of them to breach their confidential relationships with NAV and, thereby, improperly acquired NAV's trade secret information. Regarding each of the four employees, NAV alleges "[o]n information and belief," that their employment with SFS or SSLLP "creates the likelihood of the inevitable disclosure and use of NAV Trade Secret Information in SFS's business insofar as he occupies a position in which a person would customarily rely on and could not help but use the information." Further, NAV claims that, "[d]uring 2020[,] Arora has used NAV Trade Secret Information in soliciting new business for SFS from existing NAV customers." Similarly, NAV claims that Modi "has used NAV Trade Secret Information to apply processes and controls related for customers to whom SFS is offering cryptocurrency-related fund services." Finally,

NAV alleges that it has been injured by use of its trade secret information and will be injured further by inevitable disclosure of such trade secret information.

¶ 14    The defendants filed a motion to dismiss the first three counts of NAV's amended complaint pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2020)). Defendants argued, *inter alia*, that (1) the tortious interference with a contract and civil conspiracy claims were preempted by the Illinois Trade Secrets Act (ITSA) (765 ILCS 1061/1 *et seq.*), (2) NAV lacked standing to assert claims related to Back Office's former employees, and (3) NAV failed to allege sufficient facts that the defendants misappropriated NAV trade secrets, including identifying specific trade secrets or stating how such trade secrets were obtained by improper means. In addition, the defendants noted that NAV's amended complaint merely listed broad categories of claimed trade secrets and failed to allege how any such information was taken, such as by downloading computer files.

¶ 15    NAV argued that it properly stated a claim for trade secret misappropriation by alleging that the defendants induced Arora and three Back Office employees to breach their duties of confidentiality with NAV. Specifically, NAV alleged that Sudrania knew (1) that those employees were privy to NAV's confidential information and (2) had confidentiality agreements with NAV. See 765 ILCS 1065/2(b) (West 2020) (defining "misappropriation" as "acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means."). NAV further alleged that SFS recruited those employees and hired them into positions at SFS or SSLLP in which they would inevitably disclose NAV's confidential information. Thus, NAV contends that its amended complaint sufficiently pled that the defendants misappropriated NAV's information by acquiring it through the improper means of inducing Arora, Modi, Sharma, and Godha to breach their confidential relationships with NAV. See *Id.* §

1065/2(a) (defining "improper means" are "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means."). NAV's response relied on the inevitable disclosure doctrine, which enables a plaintiff to state an actionable claim under ITSA based on allegations that the defendant would inevitably rely on the plaintiff's secrets, rather than alleging actual disclosure or use of trade secrets. See *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1070 (2000) (recognizing the inevitable disclosure doctrine to establish a cognizable claim of trade secret misappropriation).

¶ 16          On June 23, 2021, the trial court entered a written order granting the defendants' motion and dismissed counts I through III with prejudice. The court found that the harm asserted in the tortious interference with a contract and civil conspiracy claims was based on misappropriation of alleged trade secrets, and thus preempted by ITSA. In addition, the court found the noncompetition terms of Arora's employment contract were unenforceable as a matter of law. Specifically, the court found that the terms were overly broad, as it prohibited Arora from working for any entity that provides hedge fund accounting services in any capacity, worldwide. As to the misappropriation claim, the court found that NAV lacked standing to assert any rights that Back Office may have regarding its former employees and merely alleged "on information and belief" that SFS conspired with SSLLP to induce Back Office employees to leave. Additionally, the court found NAV's allegations insufficient as NAV failed to specify (1) the trade secrets the employees possessed, (2) whether noncompetition agreements restricted the Back Office employees, (3) how Back Office protects trade secrets, and (4) whether the Back Office employees owed NAV a duty of confidentiality.

¶ 17    Subsequently, NAV voluntarily dismissed the remaining counts (IV through VI) of the amended complaint by order entered on July 21, 2021. NAV filed a notice of appeal from the June 23 order on August 18, 2021.

¶ 18                                II. ANALYSIS

¶ 19                           A. Appellate Jurisdiction

¶ 20    As a threshold matter, we consider our jurisdiction to review the circuit court's dismissal of three counts of NAV's six-count complaint. We have an independent duty to examine our jurisdiction even if the parties do not raise the issue. *In re Marriage of Padilla and Kowalski*, 2022 IL App (1st) 200815, ¶ 16. The Illinois Constitution of 1970 grants the appellate court jurisdiction to review final judgments entered in the circuit court. Ill. Const. 1970, art. VI, § 6; *Johnson v. Armstrong*, 2022 IL 127942, ¶ 19. An order is final, even when it disposes of less than all claims asserted in the pleadings, if the order " 'disposes of the rights of the parties, either upon the entire controversy or upon some definite and separate part thereof.' " *Id*. ¶ 21 (quoting *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 25). An order disposing of fewer than all claims, though final, is not appealable unless the circuit court makes a special finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that no just cause exists to delay appeal or enforce the judgment.

¶ 21    Here, the circuit court's June 23 order disposed of three of NAV's counts while three others remained pending. The court did not make a Rule 304(a) special finding. On July 21, the court granted NAV's motion to voluntarily dismiss the remaining three counts. NAV filed its notice of appeal from the June 23 order on August 18.

¶ 22    The June 23 order dismissing NAV's counts I through III with prejudice was a final order since it disposed of the rights of the parties upon a definitive and separate part of the action. *Cf. Dinerstein v. Evanston Athletic Clubs, Inc.*, 2016 IL App (1st) 153388, ¶ 19-20 (finding that an

order dismissing one count of a three-count complaint on the merits pursuant to section 2-619 was final when the other two counts were later voluntarily dismissed). Without a Rule 304(a) finding, however, the June 23 order was not appealable as it did not dispose of the entire case. When an order of voluntary dismissal terminates an action in its entirety, all orders final in nature, though not previously appealable, become immediately final and appealable. *Dubina v. Mesirow Realty Development, Inc.*, 178 Ill. 2d 496, 503 (1997). The June 23 order, therefore, only became appealable upon entry of the order of voluntary dismissal on July 21, disposing of all remaining claims. Accordingly, NAV filed a notice of appeal within the required 30 days after entry of the order that made the June 23 order appealable. See *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 213 (2009) ("The timely filing of a notice of appeal is both jurisdictional and mandatory."); Ill. S. Ct. R. 303(a)(1) (eff. Jul. 1, 2017) (providing a 30-day period from the entry of final judgment to file notice of appeal). Thus, we have jurisdiction to review the June 23 order.

¶ 23                                B. Standard of Review

¶ 24        The defendants filed a motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2020)), which permits a defendant to assert grounds for dismissal under both sections 2-615 (*id.* § 2-615) and 2-619 (*id.* § 2-619) of the Code in a single motion. A section 2-615 motion to dismiss tests the legal sufficiency of the complaint. *Hadley v. Doe*, 2015 IL 118000, ¶ 29. Upon the filing of such a motion, the court's inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, state sufficient facts to establish a cause of action upon which relief may be granted. *Id.* The court should consider all facts apparent from the face of the complaint, including any attached exhibits. *Id.* However, we do not take mere conclusions of law or fact as true unless supported by specific

factual allegations. *Cretella v. Azcon, Inc.*, 2022 IL App (1st) 211224, ¶ 11. A cause of action should not be dismissed unless it is clear that no set of facts can be proved under the pleadings that would entitle the plaintiff to recover. *Tuite v. Corbitt*, 224 Ill. 2d 490, 510 (2006).

¶ 25      A section 2-619 motion, though, is a " 'yes but' motion that admits both that [the] complaint's allegations are true and that the complaint states a cause of action, but argues that some other defense exists that defeats the claim nevertheless." *Doe v. University of Chicago Medical Center*, 2015 IL App (1st) 133735, ¶ 40. When considering a section 2-619 motion, a court must likewise accept all well-pled allegations in the complaint as true, as well as any inferences that may reasonably be drawn in the plaintiff's favor. *Id.* ¶ 35. Dismissal is appropriate if, considering the matter raised in the section 2-619 motion, the plaintiff can prove no set of facts that would support a cause of action. *Id.*

¶ 26      We review dismissal pursuant to sections 2-615 and 2-619 *de novo. Calloway v. Chicago Board of Election Commissioners*, 2020 IL App (1st) 191603, ¶ 9. *De novo* review means we consider the motion anew and perform the same analysis that a trial court would. *Muhammad v. Abbott Laboratories, Inc.*, 2022 IL App (1st) 210478, ¶ 22. We may affirm on any basis supported by the record. *Rivera v. Allstate Insurance Co.*, 2021 IL App (1st) 200735, ¶ 25.

¶ 27                    C. Tortious Interference with a Contract

¶ 28      Defendants assert that ITSA preempts NAV's tortious interference with a contract claim since the claim is based on misappropriation of trade secrets that Arora is alleged to be using and disclosing in his employment with SFS. NAV counters that its claim is not preempted since it is not based solely on trade secret misappropriation. Rather, NAV argues that it stated a sufficient claim by alleging that, regardless of trade secrets, the defendants induced Arora to work for a competitor and solicit NAV's customers, thereby breaching provisions of his contract with NAV.

¶ 29        To state a cause of action for tortious interference with a contract, a plaintiff must allege (1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) the defendant's awareness of the contract, (3) defendant's intentional and unjustified inducement of a breach, (4) defendant's wrongful conduct caused the third party to subsequently breach the contract, and (5) resulting damages. *Purmal v. Robert N. Wadington & Associates*, 354 Ill. App. 3d 715, 727 (2004). Here, NAV fails to allege that any damages resulted from breach of Arora's contract, such as lost customers or profits. Allegations that Arora is working for a competitor or soliciting NAV customers only go to the fourth element—whether Arora has breached his contract with NAV. Damages are a distinct element, which a plaintiff must plead and prove to maintain an action for tortious interference with a contract. *Davis v. Times Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 498 (1998). Pleading that the defendant induced a breach and that a breach occurred are not enough. We do not presume resulting damages. "Illinois is a fact-pleading jurisdiction." (Internal quotation marks omitted.) *Weiss v. Waterhouse Securities, Inc.*, 208 Ill. 2d 439, 451 (2004). "[P]laintiffs must allege facts sufficient to bring a claim within a legally recognized cause of action." *Praither v. Northbrook Bank & Trust Co.*, 2021 IL App (1st) 201192, ¶ 50 (citing *Vernon v Schuster*, 179 Ill. 2d 338, 344 (1997)). "[A]bsent the necessary allegations, even the general policy favoring the liberal construction of pleadings will not satisfy the requirement that a complaint set forth facts necessary for recovery under the theory asserted." *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 735 (2009). Accordingly, NAV's claim is deficient for failure to allege resulting damages.

¶ 30        To the extent that NAV's tortious interference with a contract claim alleges resulting damages based on Arora's use or disclosure of alleged trade secrets, the claim is preempted. With some exceptions not relevant here, ITSA "is intended to displace conflicting tort, restitutionary,

unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a) (West 2020). In other words, ITSA preempts all common law claims based on misappropriation of trade secrets. *ExactLogix, Inc. v. JobProgress*, LLC, 508 F. Supp. 3d 254, 268 (N.D. Ill. 2020). "In deciding the preemption issue, courts need not determine whether the alleged trade secret is in fact a trade secret." *Id*. Instead, we assess whether the claim is based on the misappropriation of an alleged trade secret. *Id*. ITSA does not preempt a claim if the claim "would stand even if the information was not alleged to be a trade secret" and the plaintiff seeks redress "for wrongs beyond the mere misappropriation." (Internal quotation marks omitted.) *Id*. As we found, NAV's tortious interference claim cannot stand apart from alleging misappropriation of trade secrets. And NAV does not seek redress for breaches of other provisions of Arora's contract since NAV does not allege resulting damages. Rather, NAV's claim ultimately seeks redress for misappropriation of trade secrets and is, therefore, preempted.

¶ 31    NAV cites *Alpha School Bus* to argue that ITSA does not preempt its tortious interference claim. Specifically, NAV likens its claim to the breach of fiduciary duty claim that this court found ITSA did not preempt in *Alpha School Bus*. There, a breach of fiduciary duty claim included an allegation that a former corporate officer was soliciting the plaintiffs' employees to work for his competing business. *Alpha School Bus*, 391 Ill. App. 3d at 737. This allegation was one reason, among others, that we found that the claim was "not dependent upon the misappropriation of trade secrets." *Id*. NAV argues that its allegation that Arora has solicited NAV customers on behalf of SFS is analogous. We disagree.

¶ 32    We find *Alpha School Bus* distinguishable. Unlike this case, the plaintiff in *Alpha School Bus* pled facts sufficient to establish each element of the separate claim, including a resulting injury. *Id*. at 747 (stating the necessary elements to assert a breach of fiduciary duty claim,

including injury). Notably, the plaintiff did not allege that the former corporate officer merely solicited the plaintiff's employees to potentially leave and work for the competing company. Rather, the plaintiff alleged that, in conjunction with promises of future employment with the competing company, the officer solicited the employees to sabotage the plaintiff's business and take property—and that this occurred. *Id*. at 729-30. Those actions, along with others, enabled the defendants to obtain contracts to transport public school students that the plaintiff would have otherwise been awarded. *Id*. at 733. Thus, the plaintiffs were injured by the actions they alleged as breaches of the former officer's fiduciary duty. As we observed, NAV's complaint fails to allege that any injury resulted from the defendants' interference with or Arora's breach of his contract with NAV.

¶ 33        We also observe that, to the extent NAV sought injunctive relief apart from damages, the claim is moot since the two-year term contained in Arora's contract has expired during the pendency of this appeal. See *The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 209 (2005) (finding that the enforceability of a noncompetition provision was a moot issue where noncompetition period had expired).

¶ 34        For these reasons, we find that NAV failed to state sufficient facts to establish a cause of action under a theory of tortious interference with a contract.

¶ 35                                   D. Trade Secret Misappropriation

¶ 36        To state a cause of action for misappropriation of trade secrets, a plaintiff must allege facts that the information at issue was (1) a trade secret, (2) misappropriated, and (3) used in the defendant's business. *Alpha School Bus*, 391 Ill. App. 3d at 740.

¶ 37        "[T]rade secret" means "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing,

process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 756 ILCS 1065/2(d) (West 2020).

¶ 38    In determining whether information is a trade secret, courts consider the following factors: (1) the extent to which the information is known outside of the plaintiff's business, (2) the extent to which it is known by the employees and others involved in the plaintiff's business, (3) the extent of measures plaintiff took to guard the secrecy of the information, (4) the value of the information to the plaintiff and to its competitors, (5) the amount of effort or money the plaintiff expended in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Strata Marketing*, 317 Ill. App. 3d at 1068.

¶ 39    "Whether information constitutes a trade secret focusses fundamentally on its secrecy." (Internal quotation marks omitted.) *Multimedia Sales & Marketing v. Marzullo*, 2020 IL App (1st) 191790, ¶ 17. "[T]he plaintiff must show that the information was sufficiently secret to give plaintiff a competitive advantage and plaintiff took affirmative measures to prevent others from acquiring or using the information." *Id*. The key factor to establishing secrecy "is the ease with which the information can be readily duplicated without involving considerable time, effort or expense." *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 588 (1995).

¶ 40    But, before a court can analyze the secrecy of information, a plaintiff must identify its trade secrets with specificity. *GlobalTap LLC v. Elkay Manufacturing Co.*, 13 C 632, 2015 WL 94235, *6 (N.D. Ill. Jan. 5, 2015). It would be futile to analyze whether information was sufficiently secret to derive economic value or whether the plaintiff took reasonable efforts to

maintain secrecy without first knowing, with particularity, what information comprises the secret. *Id.*

¶ 41    NAV's amended complaint sets forth a lengthy list of claimed confidential information. See *supra* ¶ 9. At times, the list uses broad, vague terms such as services and processes without further specificity. Overall, NAV's list appears vast, perhaps encompassing its entire business operation. By so pleading, NAV essentially claims that any and every bit of its information is a trade secret. Since NAV has pled in this manner, we are unable to discern, with particularity, what information comprises the alleged trade secret or secrets.

¶ 42    In addition, NAV's claim is premised on Arora and three Back Office employees joining NAV and SSLLP, respectively. NAV alleges that Arora had access to customer, pricing, and marketing information and the other three knew of NAV's processes. Yet, NAV does not narrow its claim to particular information that any of the former employees possessed.

¶ 43    Furthermore, NAV does not indicate whether any of its information is compiled in an organized format, the medium in which such information exists, or how or where such information is kept. Nor does NAV allege that any of the employees took anything besides the information contained in their own heads. "General knowledge, skill, and experience gained by an employee during employment cannot be claimed as a trade secret." *U.S. Gypsum Co. v. LaFarge North America, Inc.*, 508 F. Supp. 2d 601, 624 (N.D. Ill. 2007). "[A]n employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation." *Delta Medical Systems v. Mid-American Medical Systems, Inc.*, 331 Ill. App. 3d 777, 791 (2002).

¶ 44    We reiterate that Illinois is a fact-pleading jurisdiction. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). A plaintiff must allege facts sufficient to bring a claim within a legally recognized cause of action. *Id.* at 429-430. This pleading standard requires that a plaintiff claiming

to possess a trade secret must identify it plainly rather than " 'invite the court to hunt through *** details in search of items meeting the statutory definition.' " *National Tractor Parts Inc. v. Caterpillar Logistics Inc.*, 2020 IL App (2d) 181056, ¶ 46 (quoting *IDX Systems Corp. v. Epic Systems Corp.*, 285 F. 3d 581, 584 (7th Cir. 2002)).

¶ 45        Courts evaluating the sufficiency of trade secret misappropriation claims have required specificity. See *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 672 (N.D. Ill. 1997) ("[A plaintiff] must articulate protectable trade secrets with specificity or suffer dismissal of [their] claim."). Long lists of broad items do not suffice. *Id*. (stating that a plaintiff fails to state a claim under ITSA "by simply producing long lists of general areas of information which contain unidentified trade secrets." (Internal quotation marks omitted.)); see also *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F. 2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets."). Generic descriptions do not allege a protectable trade secret. See *National Tractor Parts Inc. v. Caterpillar Logistics Inc.*, 2020 IL App (2d) 181056, ¶ 53 (finding that " 'a process that focused on efficiency, cost, quality, safety, and transportation' " did not qualify as a trade secret since this description "contained generic terms that many companies would use to describe their assembly processes."). And a plaintiff cannot resort to claiming all its information is a trade secret. See *Nilssen*, 963 F. Supp. at 672 (observing that "a blunderbuss statement" like " 'Everything you got from us was a trade secret' " is legally insufficient); see also *Bridgeview Bank Group v. Meyer*, 2016 IL App (1st) 160042, ¶ 14 (finding that purported confidential information, which "encompassed virtual entirety of its business operations" amounted to a conclusory allegation). NAV's asserted trade secret list bears all these deficiencies. Thus, we find that NAV failed to allege specific trade secrets.

¶ 46    Some items NAV listed may be the kind of information that could constitute a trade secret, such as customer and pricing information. But NAV fails to allege requisite additional facts to show that its information is sufficiently secret to derive economic value. *Cf. Stampede Tool Warehouse*, 272 Ill. App 3d at 589 (finding that a customer list was a trade secret when developed through a "laborious" method, which required "a substantial amount of time, effort, and expense" and the list was not readily available from a public source). Instead, NAV parrots the legal conclusion that its information "is sufficiently secret such that NAV derives economic value *** for it not being generally known." See *Welsh v. Commonwealth Edison, Co.*, 306 Ill. App. 3d 148, 155 (1999) ("A pleading which merely paraphrases the elements of a cause of action in conclusory terms is not sufficient."). NAV makes no allegations to support how this is so. NAV does not claim that it spent considerable time, effort, and expense to develop its information.[5] Nor does NAV show whether it would be difficult to duplicate such information. As with the tortious interference claim, we will not infer necessary allegations that NAV failed to plead.

¶ 47    Further, a close reading of NAV's amended complaint indicates that its information may not be so secret since Sudrania already had it. Again, NAV's misappropriation claim is premised on the acquisition of trade secrets by hiring Arora and three Back Office employees (Modi, Sharma, and Gohda) in contravention of their duties of confidentiality. But, at the same time, NAV alleges that Sudrania, as a former key employee of NAV, is "intimately familiar" with NAV's information and by early 2020—before any of the four employees joined SFS or SSLLP—he "established a business to compete with NAV by replicating the business model and structure NAV utilizes using NAV *** proprietary, confidential, or trade secret information." When considering a motion to dismiss, "a court must accept as true *all* well-pleaded facts, as well as any reasonable

---

[5]We note that NAV asserts it made significant investment in developing proprietary software, but NAV does not allege that the defendants misappropriated its software.

inferences that may arise from them." (Emphasis added.) *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. The reasonable inference that arises from these allegations is that Sudrania already knew NAV's information and that NAV's information was not sufficiently secret to derive a competitive advantage. Due to NAV's lack of specificity, its amended complaint fails to identify any specific information that the defendants acquired through hiring Arora and the others that they did not already possess. We cannot simply assume otherwise. Again, liberal construction does not require us to fill in the gaps. If the defendants already possessed NAV's information, this factor not only weighs heavily against finding NAV's information to be trade secrets, but it also negates that the defendants acquired it through improper means, even if NAV's information were to be considered trade secrets.

¶ 48　　　　In addition, we observe that NAV has not made sufficient allegations that the defendants are using or that Arora and the others will inevitably disclose NAV's trade secrets. First, NAV made nearly every allegation on this element based on "information and belief." "An allegation made on information and belief is not equivalent to an allegation of relevant fact." (Internal quotation marks omitted.) *Patrick Engineering*, 2012 IL 113148, ¶ 40. We recognize that certain relevant facts of a cause of action will not be known to a plaintiff when in the exclusive knowledge of the defendant. *In re Estate of DiMatteo*, 2013 IL App (1st) 122948, ¶ 83. In such cases, " 'a complaint which is as complete as the nature of the case allows is sufficient.' " *Id*. (quoting *Yuretich v. Sole*, 259 Ill. App. 3d 311, 313 (1994)). But a plaintiff will have knowledge of its own efforts to learn the facts they allege on information and belief and should allege the efforts taken to discover those facts. *Id*. Here, NAV fails to allege how it discovered that Arora and the others have used or will inevitably disclose its claimed trade secrets. Therefore, these are not equivalent to allegations of relevant facts. See *id*. ¶ 84 (finding the same).

¶ 49    Second, inevitable disclosure is not assumed when, like here, there is no allegation that the employee copied the employer's confidential information in some tangible format. *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, 734 (N.D. Ill. 2011). Likewise, "[t]he fact that a former employee accepted a similar position with a competitor, without more, will not demonstrate inevitable disclosure." *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 284 (2005). Rather, to use this theory, a plaintiff must show that the former employee's new position will inevitably lead them to rely on the plaintiff's trade secrets. *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1096 (2007). Such inevitable reliance is established by facts showing that the employee could not operate or function without using the plaintiff's trade secrets. *Strata Marketing*, 317 Ill. App. 3d at 1071. NAV alleges no such facts. Instead, it merely repeats the element as a conclusion.

¶ 50    For these reasons, we find that NAV failed to allege sufficient facts to state an actionable claim for trade secret misappropriation. Having disposed of NAV's claims on these grounds, we need not address the parties' additional contentions about the sufficiency of NAV's amended complaint.

¶ 51                              E. Leave to Replead

Last, NAV contends that it should be permitted to file a second amended complaint to cure any deficiencies found in its amended complaint. Before the trial court, NAV included a request to replead in its response to the defendants' motion to dismiss, if the trial court were to find its amended complaint deficient. However, the trial court found that NAV's claims were deficient as a matter of law and dismissed them with prejudice, implicitly denying NAV's request to replead.

¶ 52    In *Firebirds International, LLC v. Zurich American Insurance Co.*, 2022 IL App (1st) 210558, this court analyzed the dismissal of a complaint with prejudice entered after the plaintiff

made an oral request to replead as the denial of a motion to amend a complaint. *Id.* ¶ 41. We find the situation here comparable and will do the same.

¶ 53    We review a trial court's denial of a motion to amend the complaint under an abuse of discretion standard. *Id.* ¶ 42. The factors to consider are: (1) whether the proposed amendment will cure the defective pleading, (2) whether the proposed amendment would surprise or prejudice the opposing party, (3) whether the proposed amendment was timely filed, and (4) whether the movant had previous opportunities to amend. *Id.* (citing *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992)). "If the amendment would not have cured a defect in the pleading, the other factors are superfluous." *Keefe-Shea Joint Venture v. City of Evanston*, 264 Ill. App. 3d 48, 62 (2005).

¶ 54    Here, NAV never tendered a proposed amended complaint. We note that, although the trial court dismissed NAV's claims with prejudice, NAV was not foreclosed from tendering a proposed second amended complaint along with a post-judgment motion. See 735 ILCS 5/2-1203(a) (West 2020) (providing 30-day period to file a post-judgment motion for "a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief."); *Waugh v. Morgan Stanley and Co.*, 2012 IL App (1st) 102653, ¶ 53 (observing that trial courts retain jurisdiction to modify final judgments and orders for 30 days). The failure to tender a proposed amended complaint "significantly diminishes this court's ability to determine whether the proposed amendment would have stated a viable cause of action." *Firebirds International*, 2022 IL App (1st) 210558, ¶ 43. As such, NAV offers no specifics on how it might cure the deficiencies in its amended complaint. Instead, NAV essentially asks us to speculate. We decline to do so. In addition, the fact that NAV already had one opportunity to amend its complaint further weighs against another opportunity to replead. Although we disposed of NAV's claims on different

grounds from the trial court, we find that the trial court did not abuse its discretion in dismissing NAV's claims with prejudice and we will not remand for an opportunity to file a second amended complaint.

¶ 55     After the conclusion of briefing in this appeal, NAV filed a motion to cite supplemental authority. Specifically, NAV wished to cite an order of the federal district court from a separate action involving the same parties in this case and some similar issues. We allowed the motion but, upon review, find that the district court's order does not change our analysis or disposition of this case. The federal district court's order makes plain that the case before it involved different pleadings, different facts, and a different procedural posture from this case. The matters in the federal case are outside the scope of our review in this appeal, which was limited to the sufficiency of the amended complaint in this case.

¶ 56                                    III. CONCLUSION

¶ 57     In sum, we find that NAV failed to allege sufficient facts to state a cause of action and we affirm the judgment of the circuit court.

¶ 58     Affirmed.